# HILL, ATTORNEY GENERAL OF TEXAS *v.* STONE ET AL.

No. 73-1723.  Argued January 14, 1975—Decided May 12, 1975

MARSHALL, J., delivered the opinion of the Court, in which BRENNAN, WHITE, BLACKMUN, and POWELL, JJ., joined. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., and STEWART, J., joined, *post*, p. 302. DOUGLAS, J., took no part in the consideration or decision of the case.

*David M. Kendall,* First Assistant Attorney General of Texas, argued the cause for appellant. On the brief were *John L. Hill,* Attorney General, *pro se, Larry F. York,* former First Assistant Attorney General, and *Mike Willatt* and *G. Charles Kobdish,* Assistant Attorneys General.

*Don Gladden* argued the cause for appellees. With him on the brief for appellees Stone et al. was *Marvin Collins. S. G. Johndroe, Jr.,* filed a brief for appellees city of Fort Worth et al.*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

This case requires us once again to consider the constitutionality of a classification restricting the right to vote in a local election.

Appellees, residents of Fort Worth, Tex., brought this action to challenge the state and city laws limiting the

---

*\*Edward W. Dunbar* filed a brief for El Paso County Junior College District as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed by *James F. McKibben, Jr.,* for the city of Corpus Christi; by *Marshall Boykin III* for William O. Harrison, Jr., et al.; and by *Joe Purcell, Manly W. Mumford, Fred H. Rosenfeld,* and *Harold B. Judell* for the city of Phoenix et al.

franchise in city bond elections to persons who have made available for taxation some real, mixed, or personal property. A three-judge District Court held that this restriction on suffrage did not serve any compelling state interest and therefore violated the Equal Protection Clause of the Fourteenth Amendment. *Stone* v. *Stovall,* 377 F. Supp. 1016 (ND Tex. 1974). We granted a partial stay of the District Court's order pending disposition of the appeal. 416 U. S. 963 (1974). We subsequently noted probable jurisdiction. 419 U. S. 822 (1974).

## I

The Texas Constitution provides that in all municipal elections "to determine expenditure of money or assumption of debt," only those who pay taxes on property in the city are eligible to vote. Tex. Const. Art. 6, § 3. In addition, it directs that in any election held "for the purpose of issuing bonds or otherwise lending credit, or expending money or assuming any debt," the franchise shall be limited to those qualified voters "who own taxable property in the . . . district . . . where such election is held," and who have "duly rendered the same for taxation." § 3a. The implementing statutes impose the same requirements, adding that to qualify for voting a resident of the district holding the election must have "rendered"[1] his property for taxation to the district

---

[1] To "render" property for taxation means to list it with the tax assessor-collector of the taxing district in question. Property is "rendered" for taxation either when the owner reports it or when the tax assessor-collector places it on the tax rolls himself. Taxable property includes all real, mixed, and personal property with limited exemptions, such as $3,000 for homesteads and $250 for household furnishings. Tex. Const. Art. 8, § 1. Although state law requires taxpayers to render all their taxable property, Tex. Rev. Civ. Stat. Arts. 7145, 7152 (1960 and Supp. 1974–1975), there is no penal sanction for failing to do so voluntarily.

during the proper period of the election year, and that he must sign an affidavit indicating that he has done so. Tex. Elec. Code §§ 5.03, 5.04, 5.07 (1967 and Supp. 1974–1975). The Fort Worth City Charter further provides that the city shall not issue bonds unless they are authorized in an election of the "qualified voters who pay taxes on property situated within the corporate limits of the City of Ft. Worth." Charter of the City of Fort Worth, c. 25, § 19.

In 1969, after our decisions in *Kramer* v. *Union Free School District No. 15,* 395 U. S. 621 (1969), and *Cipriano* v. *City of Houma,* 395 U. S. 701 (1969), the Texas Attorney General devised a "dual box election procedure" to be used in all the State's local bond elections. Under this procedure, all persons owning taxable property rendered for taxation voted in one box, and all other registered voters cast their ballots in a separate box. The results in both boxes were tabulated, and the bond issue would be deemed to have passed only if it was approved by a majority vote both in the "renderers' box" and in the aggregate of both boxes. This scheme ensured that the bonds would be safe from challenge even if the state-law restrictions on the franchise were later held unconstitutional.

On April 11, 1972, the city of Fort Worth conducted a tax bond election, using the dual-box system to authorize the sale of bonds to improve the city transportation system and to build a city library. Since the state eligibility restrictions had previously been construed to require only that the prospective voter render some property for taxation, even if he did not actually pay any tax on the property, *Montgomery Independent School District* v. *Martin,* 464 S. W. 2d 638 (Tex. 1971), all those who signed an affidavit indicating that they had rendered some property were permitted to vote in the "renderers'

box." Of the 29,000 voters who participated in the bond election, approximately 24,000 voted as renderers and 5,000 as nonrenderers. The transportation bond proposal was approved in both boxes and in the aggregate. The library bonds, however, were less well received. Although the library bonds were approved by a majority of all the voters, they were defeated in the renderers' box, and were therefore deemed not to have been authorized.

The appellees, three of whom had voted as nonrenderers,[2] then filed this action in the United States District Court for the Northern District of Texas, claiming that the partial disfranchisement of persons not rendering property for taxation denied them equal protection of the laws.[3] A three-judge District Court was convened; it heard argument, and on March 25, 1974, it entered judgment for the appellees. The court declared the relevant provisions of the Texas Constitution, the Texas Election Code, and the Fort Worth City Charter unconstitutional "insofar as they condition the right to vote in bond elections on citizens' rendering property for taxation." 377 F. Supp., at 1024. Although the court ruled that its decree would not make invalid any bonds already author-

[2] Of the five named appellees, three voted as nonrenderers and two as rendering property owners. They sought to represent the class of all persons who voted in the election in favor of the library bonds. The District Court certified the class as proper under Fed. Rule Civ. Proc. 23 (b)(2). The city of Fort Worth and various city officials, who were defendants below, are listed as appellees in this Court, but they support the appeal and have filed a brief urging reversal, and are not included in subsequent references to appellees.

[3] The effect of the dual-box procedure was that the nonrenderers could help defeat a bond issue, but they could not help pass it. If their votes, added to the votes of the renderers, produced a majority against the bonds, the bonds would not be issued, even if the renderers favored them. But if the renderers opposed the bonds, the nonrenderers' votes would be of no effect, even if they produced an overall majority in favor of the bond issue.

ized or any bond elections held before the date of the judgment, it ordered the city defendants to count the ballots of those who had voted in the nonrenderers' box, and it enjoined any future restriction of the franchise in state bond elections to those who have rendered property for taxation.

While all three judges concurred in the judgment, each member of the panel wrote separately. Judge Thornberry concluded that the Texas scheme was invalid because it divided the otherwise eligible voters into two classifications—renderers and nonrenderers—and that the disfranchisement of those who did not render property for taxation violated the Equal Protection Clause. Judge Woodward concurred in the result on the ground that the rendering requirement was tantamount to a requirement of property ownership, which he concluded was impermissible under this Court's decision in *Harper* v. *Virginia Board of Elections*, 383 U. S. 663 (1966). Judge Brewster concurred in the judgment, but only because he thought the case was controlled by our decision in *City of Phoenix* v. *Kolodziejski*, 399 U. S. 204 (1970), where we held invalid a statute restricting the franchise in a general obligation bond election to real property owners.

## II

Appellant, the Attorney General of Texas,[4] argues that none of this Court's cases draws into question a voting restriction of the sort used in this election. The eligibility scheme does not impose a wealth restriction on the exercise of the franchise, the appellant contends, and any

---

[4] The Attorney General was joined as a defendant because Texas law requires that he certify the validity of any municipal bond issue. Tex. Rev. Civ. Stat. Arts. 709d (1964 and Supp. 1974–1975), 4398 (1966).

classification that it does create is reasonable and should be upheld on that basis.

## A

In *Kramer* v. *Union Free School District No. 15,* 395 U. S. 621 (1969), we held that in an election of general interest, restrictions on the franchise other than residence, age, and citizenship must promote a compelling state interest in order to survive constitutional attack. The appellant in *Kramer* challenged a New York statute that limited eligibility to vote in local school board elections to persons who owned or leased taxable real property in the school district, or who had children enrolled in the public schools. We expressed no opinion in *Kramer* whether a State might in some circumstances limit the franchise to those "primarily interested" in the election,[5] but we held that the New York statute had impermissibly excluded many persons with a distinct and direct interest in the decisions of the school board, while at the same time including others with no substantial interest in school affairs. The fact that the school district was supported by a property tax did not mean that only those subject to direct assessment felt the effects of the tax burden, and the inclusion of parents would not exhaust the class of persons interested in the conduct of local school affairs.

---

[5] We answered that question in *Salyer Land Co.* v. *Tulare Water District,* 410 U. S. 719 (1973). In that case, we held that a water district created for the purpose of acquiring, storing, and distributing water for agricultural purposes could constitutionally have a board of directors selected in an election in which votes were allocated according to the assessed value of each voter's land. Because of its "special limited purpose and . . . the disproportionate effect of its activities on landowners as a group," *id.,* at 728, the Court held that the water district election was of sufficient "special interest" to a single group that the franchise could constitutionally be denied to others.

In *Cipriano* v. *City of Houma,* 395 U. S. 701 (1969), decided the same day, we invalidated a Louisiana statute limiting the franchise in local revenue bond elections to the "property taxpayers" of the district.[6]  As in *Kramer,* the city had failed to prove that under its classification all those excluded from voting were in fact substantially less interested or affected than those permitted to vote. *Id.,* at 704.  The bonds in *Cipriano* were intended to finance extension and improvement of the city's utility system.  We pointed out that the operation of a utility system affects property owners and nonproperty owners alike, and since those not included among the eligible voters often use the utility services, they might well feel the effect of outstanding revenue bonds through the utility rates they would be required to pay.

The next Term, in *City of Phoenix* v. *Kolodziejski, supra,* we ruled unconstitutional a similar restriction of the franchise to real property taxpayers in a general obligation bond issue.  The interests of property owners and nonproperty owners in a general obligation bond issue, we held, were not sufficiently disparate to justify excluding those owning no real property.  The residents of the city, whether property owners or not, had a common interest in the facilities that the bond issue would make available, and they would all be substantially affected by the outcome of the election, both in terms of the benefits provided and the obligations incurred.  Under the Phoenix bond arrangement, we noted that some of the debt service would be paid out of reve-

---

[6] In Louisiana, as in Texas, personal property as well as real property was subject to taxation, and a "property taxpayer" could include a person with only personalty.  The administrative practice was to tax only real property, however, so the effect was that in reality "property taxpayer" meant "real property taxpayer."  See *Stewart* v. *Parish School Board,* 310 F. Supp. 1172, 1173 n. 3 (ED La.), aff'd, 400 U. S. 884 (1970).

nues other than property tax receipts, so nonproperty owners would be directly affected to some extent. We added, however, that even where the municipality looks only to property tax revenues for servicing general obligation bonds, the franchise could not legitimately be restricted to real property owners:

"Property taxes may be paid initially by property owners, but a significant part of the ultimate burden of each year's tax on rental property will very likely be borne by the tenant rather than the landlord since . . . the landlord will treat the property tax as a business expense and normally will be able to pass all or a large part of this cost on to the tenants in the form of higher rent." 399 U. S., at 210.

In addition, we noted that property taxes on commercial property would normally be treated as a cost of doing business and would "be reflected in the prices of goods and services purchased by nonproperty owners and property owners alike." *Id.*, at 211.

The basic principle expressed in these cases is that as long as the election in question is not one of special interest, any classification restricting the franchise on grounds other than residence, age, and citizenship cannot stand unless the district or State can demonstrate that the classification serves a compelling state interest. See *Kramer*, 395 U. S., at 626–627; *Cipriano*, 395 U. S., at 704.

The appellant's claim that the Fort Worth election was one of special interest and thus outside the principles of the *Kramer* case runs afoul of our decision in *City of Phoenix* v. *Kolodziejski, supra*. In the *Phoenix* case, we expressly stated that a general obligation bond issue— even where the debt service will be paid entirely out of property taxes as in Fort Worth—is a matter of general interest, and that the principles of *Kramer* apply to

classifications limiting eligibility among registered voters.

In making the alternative contentions that the "rendering requirement" creates no real "classification," or that the classification created should be upheld as being reasonable, the appellant misconceives the rationale of *Kramer* and its successors. Appellant argues that since all property is required to be rendered for taxation, and since anyone can vote in a bond election if he renders any property, no matter how little, the Texas scheme does not discriminate on the basis of wealth or property.[7] Our cases, however, have not held or intimated that only property-based classifications are suspect; in an election of general interest, restrictions on the franchise of any character must meet a stringent test of justification. The Texas scheme creates a classification based on rendering, and it in effect disfranchises those who have not rendered their property for taxation in the year of the bond election. Mere reasonableness will therefore not suffice to sustain the classification created in this case.

## B

The appellant has sought to justify the State's rendering requirement solely on the ground that it extends

---

[7] As a practical matter, under Texas' scheme of tax assessment and collection, the rendering requirement may in effect create a property-related classification. Appellees' counsel informed us at oral argument that Fort Worth, like other communities in Texas, makes no affirmative effort to tax property other than realty and business personalty. Tr. of Oral Arg. 26–27. Residents are free to "render" other forms of personalty, but this is apparently seldom done. See Yudof, The Property Tax in Texas Under State and Federal Law, 51 Tex. L. Rev. 885, 889–890 (1973). As a result, in Fort Worth those with realty and business personalty are automatically eligible to vote as "renderers," while other voters must take the somewhat unusual step of voluntarily "rendering" their property for taxation. When he does so, the taxpayer affirms that he has rendered all his property, and that the valuation of the property is correct. Tex. Rev. Civ. Stat. Arts. 7164, 7184 (1960).

some protection to property owners, who will bear the direct burden of retiring the city's bonded indebtedness. The *Phoenix* case, however, rejected this analysis of the "direct" imposition of costs on property owners. Even under a system in which the responsibility of retiring the bonded indebtedness falls directly on property taxpayers, all members of the community share in the cost in various ways. Moreover, the construction of a library is not likely to be of special interest to a particular, well-defined portion of the electorate. Quite apart from the general interest of the library bond election, the appellant's contention that the rendering requirement imposes no real impediment to participation itself undercuts the claim that it serves the purpose of protecting those who will bear the burden of the debt obligations. If anyone can become eligible to vote by rendering property of even negligible value, the rendering requirement can hardly be said to select voters according to the magnitude of their prospective liability for the city's indebtedness.[8]

The appellee city officials argue that the rendering qualification furthers another state interest: it encourages prospective voters to render their property and thereby helps enforce the State's tax laws. This argument is difficult to credit. The use of the franchise to compel compliance with other, independent state objectives is questionable in any context. See *United States* v. *Texas,* 252 F. Supp. 234, 253–254 (WD Tex.), aff'd, 384 U. S. 155 (1966). It seems particularly dubious

---

[8] This argument is similar to the one made by the State of Georgia in defense of its "freeholder" requirement for membership on county boards of education. *Turner* v. *Fouche,* 396 U. S. 346, 363–364 (1970). The State there claimed that the freeholder requirement imposed no real burden, since a candidate would qualify if he owned even a single square inch of land. We concluded that if that was the case it was difficult to conceive that the requirement served any rational state interest whatsoever.

here, since under the State's construction of the rendering requirement, an individual will be given the right to vote if he renders any property at all, no matter how trivial. Those rendering solely to earn the right to vote in bond elections may well render property of minimal value, in order to qualify for voting without imposing upon themselves a substantial tax liability. The rendering requirement thus seems unlikely to have any significant impact on the asserted state policy of encouraging each person to render all of his property.[9]

In sum, the Texas rendering requirement erects a classification that impermissibly disfranchises persons otherwise qualified to vote, solely because they have not rendered some property for taxation. The *Phoenix* case

---

[9] Appellant relies on this Court's decisions in *McDonald* v. *Board of Election*, 394 U. S. 802 (1969), and *Rosario* v. *Rockefeller*, 410 U. S. 752 (1973), in defense of the classification created by Texas law in this case. In *McDonald*, however, the only issue before the Court was whether pretrial detainees in Illinois jails were unconstitutionally denied absentee ballots. The Court expressly noted that there was nothing in the record to indicate that the challenged Illinois statute had any impact on the appellants' exercise of their right to vote. See 394 U. S., at 807–809. Any classification actually restraining the fundamental right to vote, the Court noted, would be subject to close scrutiny. In *Rosario*, the Court upheld a neutral requirement that a voter register a party preference 30 days in advance of the general election in order to be eligible to participate in the succeeding primary election. Because the registration requirement served the "legitimate and valid state goal" of "preservation of the integrity of the electoral process," 410 U. S., at 761, and because it imposed no special burden on any class before the Court, see *id.*, at 759 n. 9, the Court held that the time limitation on registration did not violate either the Equal Protection Clause or the First and Fourteenth Amendment right of association. By contrast, the Texas scheme imposes a restriction on the franchise having no perceptible purpose or effect in preserving the integrity of the electoral process; instead, it excludes a portion of the electorate for failing to comply with a wholly independent state policy.

establishes that Fort Worth's election was not a "special interest" election, and the state interests proffered by appellant and the city officials fall far short of meeting the "compelling state interest" test consistently applied in *Kramer, Cipriano,* and *Phoenix.*

## III

In order to avoid the possibility of upsetting previous bond elections in the State, the District Court declined to give retroactive effect to its judgment. We have followed the same course in our prior cases dealing with voting classifications in bond elections, see *Cipriano,* 395 U. S., at 706; *Phoenix,* 399 U. S., at 213–215, and we agree with the District Court's determination not to give its ruling retroactive effect. Since the portion of the District Court's judgment invalidating the state constitutional and statutory provisions has been in full effect since that time,[10] and since some local bond elections may subsequently have been conducted in reliance on that judgment, we hold that the District Court's ruling should apply only to those bond authorization elections that were not final on the date of the District Court's judgment. As to other jurisdictions that may have restrictive voting classifications similar to those in Texas,[11] we hold that our decision should not apply where

[10] The partial stay of the District Court's judgment was granted only to the extent that the judgment below had prohibited the use of the dual-box election procedure. 416 U. S. 963.

[11] There may be no such jurisdictions, at least where bond election voting qualifications are governed by statewide statutes and constitutional provisions. We are told that in the 15 States besides Texas that restricted the franchise to taxpayers in some fashion at the time the *Phoenix* case was decided, all qualified voters are now permitted to participate in bond elections. Brief for City of Phoenix, Ariz., et al. as *Amici Curiae* 19. In addition to the 13 States referred to in *City of Phoenix* v. *Kolodziejski,* 399 U. S.

the authorization to issue the securities is legally complete as of the date of this decision.

*Affirmed.*

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and MR. JUSTICE STEWART join, dissenting.

The Texas Constitution restricts the vote in general obligation bond elections to those who render taxable property with local taxing officials. Tex. Const. Art. 6, § 3a. All real, personal, or mixed property owned by any citizen of the State is taxable property under state law. Tex. Const. Art. 8, § 1; Tex. Rev. Civ. Stat. Arts. 7145, 7147 (1960 and Supp. 1974–1975). And all citizens of the State are required by law to render all such taxable property with local taxing officials on a yearly basis in order that it be added to local tax rolls. Tex. Rev. Civ Stat. Arts. 7145, 7151, 7152, 7153, 7189 (1960 and Supp. 1974–1975).

The rendering requirement for voting is satisfied by the listing of any single item of property, even though of purely nominal worth, with taxing officials and the completion of an affidavit provided at polling places with a description of any single item of property which the voter has properly rendered. Tex. Elec. Code § 5.03 *et seq.* (1967 and Supp. 1974–1975); *Montgomery Independent School District* v. *Martin*, 464 S. W. 2d 638, 640 (Tex. 1971); *Dubose* v. *Ainsworth*, 139 S. W. 2d 307, 308 (Tex. Civ. App. 1940). Rendering immedi-

---

204, 213 n. 11 (1970), Nevada and Wyoming utilized a dual-box election procedure much like Texas', but in both cases that procedure has been abandoned. See Nev. Laws 1971, c. 49; Wyo. Laws 1973, c. 251.

ately before the election of any item of property qualifies, even though untimely under the rendering statutes, *Markowsky* v. *Newman,* 134 Tex. 440, 449–450, 136 S. W. 2d 808, 813 (1940), and the absence of adequate facilities for the rendering of property eliminates the rendition requirement. *Hanson* v. *Jordan,* 145 Tex. 320, 198 S. W. 2d 262 (1946); *Green* v. *Stienke,* 321 S. W. 2d 95 (Tex. Civ. App. 1959). Under state law, the Texas elector who renders a pair of shoes or a bicycle on election day casts a vote no different from that of a rendering cattle baron.

Not surprisingly, the Texas Supreme Court in *Montgomery Independent School District* v. *Martin, supra,* upheld the rendering qualification:

> "[V]oter qualifications of ownership under the Texas constitutional and statutory provisions stated above, as interpreted by our decisions, are so universal as to constitute no impediment to any elector who really desires to vote in a bond election. A voter is qualified if he renders any kind of property of any value, and he need not have actually paid the tax.
>
> .        .        .        .        .
>
> " . . . One who is willing to vote for and impose a tax on the property of another should be willing to assume his distributive share of the burden. . . .
>
> .        .        .        .        .
>
> ". . . To allow some property owners to vote in that kind of an election, and at the same time to permit them to avoid their fair share of the resulting obligation, would confer preferential rights." 464 S. W. 2d, at 640–642.

Appellees in the instant case have not drawn our attention to a totally propertyless citizen of Fort Worth, poorer than Diogenes, whose total lack of ownership pre-

cludes him from complying with the rendering requirement. Instead, the alleged deprived class in the instant case consists of those who violated their legal obligation under state law, choosing not to render any property by reason of carelessness, a tax-avoidance motive, or otherwise. And the alleged deprivation of equal protection lies in self-disfranchisement caused by their failure to utilize readily available facilities to render property.

Since laws considered by this Court under the Equal Protection Clause are not abstract propositions subject to a requirement of disembodied equality which invalidates classifications without examination of the circumstances surrounding them, *Tigner* v. *Texas,* 310 U. S. 141, 147 (1940), we have without exception in passing upon governmental requirements affecting voting looked to the character of the classification challenged as denying equal protection and the individual interests affected by it. *Williams* v. *Rhodes,* 393 U. S. 23, 30 (1968); *Dunn* v. *Blumstein,* 405 U. S. 330, 335, 336 (1972). And our prior cases have held that scrutiny under this Clause is triggered only where restrictions have a real and appreciable impact on ability to exercise the franchise. See *McDonald* v. *Board of Election,* 394 U. S. 802, 807–808 (1969); *Kramer* v. *Union Free School District No. 15,* 395 U. S. 621, 626–627, n. 6 (1969); *Gordon* v. *Lance,* 403 U. S. 1, 5 (1971); *Bullock* v. *Carter,* 405 U. S. 134, 144 (1972).

In *Rosario* v. *Rockefeller,* 410 U. S. 752 (1973), we upheld a New York registration requirement requiring registration in a party 11 months in advance of its primary as a prerequisite to participation in the primary, stating:

"We cannot accept the petitioners' contention. None of the cases on which they rely is apposite to the situation here. In each of those cases, the State

totally denied the electoral franchise to a particular class of residents, and there was no way in which the members of that class could have made themselves eligible to vote. . . . Section 186 of New York's Election Law, however, is quite different. It did not absolutely disenfranchise the class to which the petitioners belong—newly registered voters . . . . Rather, the statute merely imposed a time deadline on their enrollment, which they had to meet in order to participate in the next primary. . . . The petitioners do not say why they did not enroll prior to the cutoff date; however, it is clear that they could have done so, but chose not to. Hence, if their plight can be characterized as disenfranchisement at all, it was not caused by § 186, but by their own failure to take timely steps to effect their enrollment." *Id.,* at 757–758.

Even the four dissenting Members of the Court in that case would have required a "serious burden or infringement" on the right to vote as a prerequisite to the establishment of a constitutional violation. *Id.,* at 767 (POWELL, J., joined by DOUGLAS, BRENNAN, and MARSHALL, JJ., dissenting). See also *id.,* at 765.

In the immediate case, appellees and the class of nonrenderers they represent could have easily complied with the rendering qualification, imposed not only as a prerequisite for voting but also as a legal duty necessary to the orderly operation of a voluntary self-assessment taxing system. The burden imposed by the qualification was *de minimis* and compliance was universally easy.

Despite this, the Court, without inquiry into the impact of the Texas qualification on appellees' ability to vote, concludes that the Texas scheme is unconstitutional. *Ante,* at 298, 300–301.

As might be expected when dealing with provisions

of state law in the abstract, the theoretical arguments advanced both in support of the constitutionality of the provisions involved here, and against their constitutionality, tend to cut both ways. The State contends that because anyone could have complied with the rendering qualification, the burden on the franchise is minimal. The Court disposes of this contention by concluding that in such event the rendering requirement must serve no valid state policy. The State also contends that the rendering requirement does serve the state policy of increasing the amount of personal property on the tax rolls, which property in turn will be taxed to retire the bonded indebtedness incurred as a result of the election in question. The Court's response to this contention is that if this be the case, the requirement unreasonably burdens the franchise. This constitutional dialogue is somewhat less than edifying, and may be traced in part to the dichotomy drawn by *Kramer* v. *Union Free School District No. 15, supra,* where all voting qualifications in an "election of general interest," *ante,* at 295, were herded into two categories. Those dealing with "residence, age, and citizenship," *ibid.,* received the Court's imprimatur, while the "strict scrutiny" test was to be applied to other requirements. The basis of this judicially created classification would itself scarcely survive a "rational basis" test, unexplained as it is by any of our decisions. But even taking *Kramer* on its own terms, no sound reason is advanced for applying it to the situation before us now.

The Court distinguishes, *ante,* at 300 n. 9, our decision in *Rosario* on the grounds that the New York registration requirement involved in that case, unlike the Texas rendering qualification for bond elections, was directed toward " 'preserv[ing] the integrity of the electoral process.' "

As a factual matter, the offered distinction is a doubtful one. The purpose sought to be served by the registration requirement examined in *Rosario* was the prevention of "raiding": the crossing of party lines by members of one party in order to affect the outcome of the primary election of another political party. The rendering qualification under challenge in the instant case is designed in part to prevent citizens who violate their legal obligations by totally avoiding any portion of their fair share of obligations resulting from a bond election, however small that share may be, from influencing the process which results in the imposition of such obligations. If the integrity of the electoral process is violated by allowing citizens, who are unwilling to assume the responsibilities of party membership, to vote in party primaries, it is difficult to understand how it is less violated by allowing citizens, who are unwilling to assume their fair share of the obligations occurring from a bond election, to vote in such an election.

As the Court indicates, *ante*, at 298 n. 7, appellees at oral argument asserted that the rendering requirement in practice functions as a property-related classification since realty and business personalty make up virtually all of the property actually subject to taxation in Fort Worth. However, appellees also conceded that their allegation was without support in the record in this case. Tr. of Oral Arg. 31. To the extent that the record does speak to appellees' assertion, it shows the rendition of substantial amounts of personal property in Fort Worth and in the State generally. App. 68, 81–84. While one member of the three-judge panel below indicated his suspicion that the rendering requirement operated as a *de facto* exclusion of non-real-property owners, another member of the panel indicated his disagreement. Compare 377 F. Supp. 1016, 1020 (opinion of Thorn-

berry, J.), with *id.,* at 1025 (opinion of Woodward, J., specially concurring). In light of the serious question raised by this disagreement and the absence of evidence in the record resolving it, I would vacate the judgment below and remand this case for factual determination of whether the rendering requirement as administered in Texas has the practical effect of impermissibly disfranchising identifiable groups of voters such as nonreal-property owners and thereby constitutes a genuine burden on the franchise. Cf. *City of Phoenix* v. *Kolodziejski,* 399 U. S. 204 (1970).