ANDREA WURTZEL, NANETTE MONDEAU, KEVIN GIBSON AND STEPHEN GORSE, INDIVIDUALLY, AND THE VOTING AGE COALITION, PLAINTIFFS-APPELLANTS, v. ROBERT M. FALCEY, ACTING SECRETARY OF STATE OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

Argued November 18, 1975—Decided March 1, 1976.

*Mr. David Friedland,* argued the cause for plaintiffs-appellants (*Messrs. Friedland & Friedland,* attorneys).

*Mr. Stephen Skillman,* Assistant Attorney General, argued the cause for defendant-respondent (*Mr. William F. Hyland,* Attorney General, attorney; *Mr. Skillman,* of counsel; *Mr. Skillman and Mr. Guy S. Michael,* Deputy Attorney General, on the brief).

PER CURIAM. This appeal derives from a declaratory judgment action in which plaintiffs-appellants challenged on equal protection grounds the minimum age requirements for certain elective offices in the New Jersey Constitution, which operated to deny them a place on the ballot in the 1973 general election. Art. IV, § I, ¶ 2 sets an age minimum of 21 years for members of the Assembly and 30 years for State Senators. When they attempted to run, none of the named plaintiffs was over 19 years of age, hence none would have been able to meet these age minima. The State's motion for summary judgment was granted by the trial court and affirmed by the Appellate Division in an unreported opinion. The appeal is here as of right. *R.* 2:2–1(a).

We affirm. There is no fundamental right to run for office. *Bullock v. Carter,* 405 *U. S.* 134, 142–43, 92 *S. Ct.* 849, 855–856, 31 *L. Ed.* 2d 92, 99 (1972). As a practical matter substantial state regulation affecting the selection and qualification of candidates must exist to ensure fair and honest elections and keep order in the democratic process. *Storer v. Brown,* 415 *U. S.* 724, 729, 94 *S. Ct.* 1274, 1278, 39 *L. Ed.* 2d 714, 723 (1974). Ballot regulations necessarily affect the franchise, which is a fundamental right, *Harper v. Virginia State Bd. of Elections,* 383 *U. S.* 663, 86 *S. Ct.* 1079, 16 *L. Ed.* 2d 169 (1966); *Dunn v. Blumstein,* 405 *U. S.* 330, 92 *S. Ct.* 995, 31 *L. Ed.* 2d 274 (1972), and ordinarily restrictions on the franchise must meet a stringent test of justification. *Hill v. Stone,* 421 *U. S.* 289, 297, 95 *S. Ct.* 1637, 1643, 44 *L. Ed.* 2d 172, 179 (1975); *Worden v. Mercer Cty. Bd. of Elections,* 61 *N. J.* 325, 346 (1972). However, classifications based on residence, age, and citizenship are expressive of the state's legitimate interest in the integrity of the ballot, and if these classifications are reasonable, they are constitutionally inoffensive. *Hill v. Stone, supra; Gangemi v. Rosengard,* 44 *N. J.* 166, 173–74 (1965); see *Oregon v. Mitchell,* 400 *U. S.* 112, 91 *S. Ct.* 260, 27 *L. Ed.* 2d 272 (1970). Guided by these principles courts have consistently recognized that

reasonable age classifications affecting candidates do not have such an impact upon voters' or candidates' rights as to offend the equal protection clause. *E. g., Manson v. Edwards,* 482 F. 2d 1076 (6th Cir. 1973); *Blassman v. Markworth,* 359 *F. Supp.* 1 (N. D. Ill. 1973); *Human Rights Party v. Sec'y. of State for Michigan,* 370 *F. Supp.* 921 (E. D. Mich. 1973).

■ Appellants have brought forth no new or compelling arguments that would lead us to question what appears to be a settled area of constitutional adjudication. We are satisfied that the minimum age requirements set forth in the New Jersey Constitution relate to the State's interest in maintaining the integrity of the ballot by ensuring competent candidates. In this context the requirements are reasonable. They fall with equal weight on all voters and do not permanently exclude any candidate, *Blassman v. Markworth, supra,* 359 *F. Supp.* at 7. It is not entirely without significance that their presence in our constitution is mirrored by the age requirements fixed in the U. S. Constitution for members of Congress, Art. I, § 2 (Representatives, 25 years) and § 3 (Senators, 30 years). See *Manson v. Edwards, supra,* 482 *F.* 2d at 1078; *Raza Unida Party v. Bullock,* 349 *F. Supp.* 1272, 1283 (W. D. Texas 1972), aff'd in part, vacated in part *sub nom. American Party of Texas v. White,* 415 *U. S.* 767, 94 *S. Ct.* 1296, 39 *L. Ed.* 2d 744 (1974).

■■ Nor are we persuaded by appellants' contention that the State must show a compelling interest to justify the classifications created by these age requirements. "[T]o test the power to establish an age qualification by the 'compelling interest' standard is really to deny a State any choice at all, because no State could demonstrate a 'compelling interest' in drawing the line with respect to age at one point rather than another." *Oregon v. Mitchell, supra,* 400 *U. S.* at 294, 91 *S. Ct.* at 349, 27 *L. Ed.* 2d at 379. (Separate opinion of Stewart, J.) Rather, the power to establish an age requirement necessarily involves the power to choose a reason-

able one, *id.* at 294–95, 91 *S. Ct.* at 349, 27 *L. Ed.* 2d at 379, which is what the State has done. Therefore an evidentiary hearing on the relative equality of persons eighteen and twenty-one years old, sought here by appellants, is irrelevant to their equal protection claim once the determination is made that the age classifications provided by the State Constitution are reasonable. Appellants' offer of proof to the trial judge that the classification was unreasonable was limited to the claim that persons eighteen years old possess the same "biological, physiological, hygienical and sexual, and mental capacities" as do those who are twenty-one. This demonstration would not bear on the issue of whether both groups possess the same maturity and experience, far more critical to the State's interest in ensuring competent candidates — if indeed such a contention is susceptible of proof. In short, this case simply raises an objection as to where the line was drawn without actually projecting a constitutional infringement.

Affirmed.

PASHMAN, J. (dissenting). Plaintiffs challenge the constitutional validity of Article IV, Section I, Paragraph 2 of the New Jersey Constitution of 1947[1] on the grounds that the age requirements established by that provision deny them the equal protection of the law required by the United States Constitution.

---

[1] *N. J. Const.* (1947), Art. IV, § I, ¶ 2 provides:

2. Eligibility for membership in Legislature

2. No person shall be a member of the Senate who shall not have attained *the age of thirty years*, and have been a citizen and resident of the State for four years, and of the district for which he shall be elected one year, next before his election. No person shall be a member of the General Assembly who shall not have attained *the age of twenty-one years* and have been a citizen and resident of the State for two years, and of the district for which he shall be elected one year, next before his election. No person shall be eligible for membership in the Legislature unless he be entitled to the right of suffrage. [Emphasis supplied].

Plaintiffs are four young adults who sought to place their names on the ballot as independent candidates for the State Senate and State Assembly in the November 1973 election. Although they had obtained the requisite number of signatures for their petitions and had otherwise complied with the requirements for candidacy, Acting Secretary of State Robert M. Falcey refused to accept their petitions because plaintiffs did not satisfy the age requirements set forth in *N. J. Const.* (1947), Art. IV, § I, ¶ 2.[2] In July 1973, plaintiffs brought this action challenging that provision.

The matter was heard on cross-motions for summary judgment. The trial judge, applying the traditional test for equal protection cases,[3] entered judgment for defendant and ruled that since the age requirements were rationally related to a legitimate state purpose, they were unassailable. To justify his decision, the trial judge found as a fact, that older people exhibit a greater capacity for mature re-

[2]In July 1973, when this action was initiated, the four plaintiffs were 19, 18, 18 and 17 years of age, respectively. Therefore, none of them would have been able to meet the minimum age requirements of 21 years for members of the Assembly and 30 years for members of the Senate.

[3]During the last several decades, the United States Supreme Court has generally applied two distinct tests in determining whether a state statute offends the Equal Protection clause of the Fourteenth Amendment. Under the so-called "traditional test" (also known as the rational relation test), a statute will survive an equal protection challenge if the classification is "rationally related" to the advancement of a legitimate state goal. By contrast, where the statutory classification is based either on "suspect" criteria or affects a "fundamental right," a more stringent standard has been employed. Under this more stringent test, the statute will be held to be violative of equal protection unless the classification is justified by a "compelling state interest." *San Antonio Independent School District v. Rodriguez*, 411 *U. S.* 1, 17, 93 *S. Ct.* 1278, 36 *L. Ed.* 2d 16 reh. den., 411 *U. S.* 959, 93 *S. Ct.* 1919, 36 *L. Ed.* 2d 418 (1973) ; *Shapiro v. Thompson*, 394 *U. S.* 618, 658, 89 *S. Ct.* 1322, 22 *L. Ed.* 2d 600 (1969) (Harlan, J., dissenting) ; *McDonald v. Bd. of Election*, 394 *U. S.* 802, 89 *S. Ct.* 1404, 22 *L. Ed.* 2d 739 (1969) ; "Developments in the Law — Equal Protection," 82 *Harv. L. Rev.* 1065, 1077 (1969).

flection, a higher quantum of worldly experience, a more responsible approach to the duties of office and a more stable political outlook than do adults under the age of 21. The Appellate Division thereafter affirmed in an unreported opinion and plaintiffs appealed to this Court as of right. *R.* 2:2–1(a).

I

In today's decision, the majority affirms the judgment of the lower court and declares that the age requirements of *N. J. Const.* (1947), Art. IV, § I, ¶ 2 are neither based on a "suspect" criterion nor violative of a "fundamental right." Consequently, they would find that defendant need only show that the age requirements are rationally related to a legitimate state purpose. Concluding that these restrictions are "expressive of the State's legitimate interest in the integrity of the ballot," the majority holds that the "classifications are reasonable" and, hence, are "constitutionally unoffensive." *Ante* at 403.

I agree with the majority that classification on the basis of age is not "suspect" for purposes of ascertaining and enforcing equal protection of the laws in this case. *Human Rights Party v. Secretary of State,* 414 *U. S.* 1058, 94 *S. Ct.* 563, 38 *L. Ed.* 2d 465 (1973), *aff'g mem.,* 370 *F. Supp.* 921 (E. D. Mich. 1973); *Gaunt v. Brown,* 409 *U. S.* 809, 93 *S. Ct.* 69, 34 *L. Ed.* 2d 71 (1972), *aff'g mem.,* 341 *F. Supp.* 1187 (S. D. Ohio 1972); *Manson v. Edwards,* 482 *F.* 2d 1076, 1077 (6 Cir. 1973); *Whitehead v. Westbrook,* —— *U. S.* ——, 96 *S. Ct.* 388, 46 *L. Ed.* 2d 299, 44 *U. S. L. W.* 3295 (1975), *aff'g mem.,* (W. D. Ark. 1975); *cf. Ramirez v. Weinberger,* 415 *U. S.* 970, 94 *S. Ct.* 1553, 39 *L. Ed.* 2d 867 *aff'g mem.,* 363 *F. Supp.* 105 (N. D. Ill. 1973). It is also true that there is no "fundamental right" to run for office which would otherwise invoke the operation of the "compelling state interest" test. See *supra* n. 3; *Bullock v. Carter,* 405 *U. S.* 134, 142–43, 92 *S. Ct.* 849, 31 *L. Ed.*

2d 92 (1972); *Blassman v. Markworth,* 359 *F. Supp.* 1, 6 (N. D. Ill. 1973); *Walker v. Yucht,* 352 *F. Supp.* 85, 90 (D. Del. 1972). Hence, there is no basis for subjecting the challenged provision to the strictest form of judicial scrutiny. Nevertheless, the inquiry does not and should not end here.

Courts now recognize that the opportunity to run for public office, while not a "fundamental right" in the constitutional sense, is nonetheless a basic right of considerable importance. Its significance stems largely from its inextricable tie to the franchise, *Bullock v. Carter, supra,* 405 *U. S.* at 144, 92 *S. Ct.* at 856, 31 *L. Ed.* 2d at 100; *American Party of Texas v. White,* 415 *U. S.* 767, 794, 94 *S. Ct.* 1296, 39 *L. Ed.* 2d 744, reh. den., 416 *U. S.* 1000, 94 *S. Ct.* 2414, 40 *L. Ed.* 2d 777 (1974); *Williams v. Rhodes,* 393 *U. S.* 23, 30, 89 *S. Ct.* 5, 21 *L. Ed.* 2d 24 (1968); *Chimento v. Stark,* 414 *U. S.* 802, 94 *S. Ct.* 125, 38 *L. Ed.* 2d 39 *aff'g mem.,* 353 *F. Supp.* 1211, 1215 (D. N. H. 1973); *Thomas v. Mims,* 317 *F. Supp.* 179 (S. D. Ala. 1970), which is a fundamental right.[4] See *ante* at 403. In *Bullock v. Carter,* the United States Supreme Court explained the nature of this relationship as follows:

. . . The initial and direct impact of filing fees is felt by aspirants for office, rather than voters, and the Court has not heretofore attached such fundamental status to candidacy as to invoke a rigorous standard of review. However, the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative

[4]Several recent cases have implied, but not directly held, that a standard less stringent than the "compelling state interest" standard might be applied even to classifications restricting the right to vote where it is based on residence, age or citizenship. *Hill v. Stone,* 421 *U. S.* 289, 297, 95 *S. Ct.* 1637, 1643, 44 *L. Ed.* 2d 172, 179, reh. den., 422 *U. S.* 1029, 95 *S. Ct.* 2617, 45 *L. Ed.* 2d 686 (1975); *Kramer v. Union Free School District No. 15,* 395 *U. S.* 621, 625–26, 89 *S. Ct.* 1886, 23 *L. Ed.* 2d 583 (1969); *Cipriano v. City of Houma,* 395 *U. S.* 701, 704 *n.* 4, 89 *S. Ct.* 1897, 23 *L. Ed.* 2d 647 (1969).

effect on voters. Of course, not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review. McDonald v. Board of Election, 394 U. S. 802, 89 S. Ct. 1404, 22 L. Ed. 2d 739 (1969). Texas does not place a condition on the exercise of the right to vote, nor does it quantitatively dilute votes that have been cast. Rather, the Texas system creates barriers to candidate access to the primary ballot, thereby tending to limit the field of candidates from which voters might choose. The existence of such barriers does not of itself compel close scrutiny. Compare Jenness v. Forston, 403 U. S. 431, 91 S. Ct. 1970, 29 L. Ed. 2d 554 (1971). . . . [But] in approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters. [405 *U. S.* at 142–43, 92 S. Ct. at 855, 31 *L. Ed.* 2d at 99–100].

In a similar vein, Chief Justice Weintraub, writing for this Court in *Gangemi v. Rosengard,* 44 *N. J.* 166 (1965) (striking down a provision requiring that elected city officers be registered voters for at least two years prior to their election) also stressed the importance of the right to run for political office:

. . . [T]he right to vote would be empty indeed if it did not include the right of choice for whom to vote. See *Ransom v. Black,* 54 *N. J. L.* 446, 460 (*Sup. Ct.* 1892), affirmed 65 *N. J. L.* 688 (*E. & A.* 1893) ; *Imbrie v. Marsh,* 5 *N. J. Super.* 239, 245–246 (*App. Div.* 1949), affirmed 3 *N. J.* 578 (1950) ; *In re City Clerk of Paterson,* 88 *A.* 694, 695–696 (*N. J. Sup. Ct.* 1913 — not officially reported) ; *Gansz v. Johnson,* 9 *N. J. Super.* 565, 567 (Law Div. 1950). This does not mean there must be perfect equality between the two; *Stothers v. Martini,* 6 *N. J.* 560 (1951), held there is not. But it does mean that in judging the validity of a restraint upon eligibility for elective office, we must be mindful that the restraint is upon the right to vote as well. Mr. Chief Justice Warren said in *Reynolds v. Sims, supra,* 377 *U. S.* [533] at *p.* 555, 84 *S. Ct.* [1362] at *p.* 1378, 12 *L. Ed.* 2d [506] at *p.* 523:
"*\* \* \* The right to vote freely for the candidate of one's choice is of the essence of a democratic society,* and any restrictions on that right strike at the heart of representative government."
\*     \*     \*     \*     \*     \*     \*     \*
Far from being unrestricted, the power to prescribe qualifications for elective office is sharply limited by the constitutional guaranty of a right to vote. *A prescribed qualification for office must relate to the needs of officeholding as such or the special needs of the particular office involved, with the voters free to judge the personal or individual fitness of the candidates who have those basic qualifications.* The line separating the basic needs of office from the individual

fitness of a candidate, perhaps more easily felt than described, is vital, and the fundamental value involved is best served if the judiciary insists that the reason for the inroad upon the right to vote be real, and clear, and compelling. [44 *N. J.* at 170–171; emphasis supplied].

As the majority observes, "the franchise . . . is a fundamental right [citations omitted], and ordinarily restrictions on the franchise must meet a stringent test of justification." *Ante* at 403. Even though the right to run for public office is not itself a full-fledged "fundamental right" and hence restrictions on it (*e. g.,* on the basis of residence, citizenship and age) are generally permissible, such restrictions may not be arbitrary or indiscriminate. Due to their inevitable impact on the fundamental right to vote, all restrictions on candidacies for public office must be reasonable and must be rationally related to a legitimate state purpose. The State interests which allegedly support such restrictions must be "real and substantial" and not just "hypothetical."

In light of these considerations, courts which have recently reviewed laws prescribing qualifications for elective office have applied a standard of review which, though less exacting than that applied to direct restrictions on the franchise, is certainly more exacting than the test employed here by this Court. In *Bullock v. Carter, supra,* for example, after holding that there is no "such fundamental status to candidacy as to invoke a rigorous standard of review," 405 *U. S.* at 142–43, 92 *S. Ct.* at 855, 31 *L. Ed.* 2d at 99, the Court invalidated a Texas statute requiring the payment of filing fees as a condition to placing a candidate's name on the ballot. Finding that the challenged provision "has a real and appreciable impact on the exercise of the franchise . . .," 405 *U. S.* at 144, 92 *S. Ct.* at 856, 31 *L. Ed.* 2d at 100. Chief Justice Burger, writing for the Court, stated that "the laws must be *'closely scrutinized'* and found *reasonably necessary* to the accomplishment of legitimate state objectives in order to pass constitutional muster." 405 *U. S.* at 144, 92 *S. Ct.* at 856, 31 *L. Ed.* 2d at 100 (emphasis supplied). Although this test

clearly exhibits greater bite than the toothless and ineffective test employed by the majority here,[5] nowhere in his opinion did Chief Justice Burger mention the strict "compelling state interest" test as such. Rather, he concluded that the statute was invalid because the state "failed to establish the requisite justification for [the] system." 405 *U. S.* at 149, 92 *S. Ct.* at 859. Similarly, in *Turner v. Fouche,* 396 *U. S.* 346, 90 *S. Ct.* 532, 24 *L. Ed.* 2d 567 (1970), the Court invalidated a Georgia statute restricting school board membership to freeholders. While finding it unnecessary to rely on the "compelling state interest" test and purporting to apply the rational relation standard, 396 *U. S.* at 362, 90 *S. Ct.* at 541, 24 *L. Ed.* 2d at 580, the Court, in fact, employed a standard somewhat more stringent than the traditional test for denial of equal protection.[6] 396 *U. S.* at 363–64, 90 *S. Ct.* at 541. See *supra* n. 5.

[5]The majority in the instant case seems to apply the traditionally toothless "rational relation" test once described by Chief Justice Warren as follows:

[The equal protection clause] permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if *any state of facts* reasonably may be conceived to justify it. [*McGowan v. Maryland,* 366 *U. S.* 420, 425–26, 81 *S. Ct.* 1101, 1105, 6 *L. Ed.* 2d 393 (1966) ; emphasis supplied].

Again, in *McDonald v. Bd. of Election Comm'rs, supra,* the Chief Justice stated:

Legislatures are presumed to have acted constitutionally even if source materials normally resorted to for ascertaining their grounds for action are otherwise silent, and their statutory classifications will be set aside only if no grounds can be conceived to justify them. [394 *U. S.* at 809, 89 *S. Ct.* at 1408, 22 *L. Ed.* 2d at 745].

[6]The emergence of a strengthened "rational relation" test as an intermediate approach to equal protection cases is not confined to the above examples. See, *e. g., Chicago Police Dept. v. Mosley,* 408 *U. S.* 92, 95, 92 *S. Ct.* 2286, 33 *L. Ed.* 2d 212 (1972) ; *Reed v. Reed,* 404 *U. S.* 71, 76, 92 *S. Ct.* 251, 30 *L. Ed.* 2d 225 (1971). In re-

Art. IV, § I, ¶ 2 of the New Jersey Constitution of 1947 denies all citizens between the ages of 18 and 20 the right to run for the State Senate and Assembly. Because this group comprises 10.26% of the State's eligible voters, denial of this right severely restricts the electorate's right to choose candidates by limiting the number and variety of available

cent years, there have been a number of cases where the Supreme Court has held a statute to be violative of the Equal Protection clause without mentioning the "strict scrutiny" formula. See Gunther, "The Supreme Court: A Model for a Newer Equal Protection," 86 *Harv. L. Rev.* 1, 18–19 (1972). Several of our own decisions have expressly recognized this more meaningful approach to the guarantee of equal protection. In *Robinson v. Cahill*, 62 *N. J.* 473 (1973), for example, we noted that there will be cases where "the court may call upon the State to demonstrate the existence of a *sufficient public need* for the restraint or the denial," without requiring proof of a compelling state interest. 62 *N. J.* at 492 (emphasis supplied). See also, *Borough of Collingswood v. Ringgold,* 66 *N. J.* 350, 370 (1975) ; *Sente v. Mayor and Mun. Coun., Clifton,* 66 *N. J.* 204, 226 (1975) (Pashman, J., dissenting) ; *Jackman v. Bodine,* 55 *N. J.* 371, 382–83, cert. den., 400 *U. S.* 849, 91 *S. Ct.* 39, 27 *L. Ed.* 2d 87 (1970) ; *Independent Electricians & Electrical Contractors' Ass'n v. New Jersey Bd. of Examiners of Electrical Contractors,* 48 *N. J.* 413, 423–27 (1967) ; *Jones v. Falcey,* 48 *N. J.* 25, 39–40 (1966). Professor Gunther has described this *strengthened* "rational relation" test as follows:

The model suggested by the recent developments would view equal protection as a means-focused, relatively narrow, preferred ground of decision in a broad range of cases. Stated most simply, it would have the Court take seriously a constitutional requirement that has never been formally abandoned: that legislative means must substantially further legislative ends. The equal protection requirement that legislative classifications must have a substantial relationship to legislative purposes is, after all, essentially a more specific formulation of that general principle. * * * Putting consistent new bite into the old equal protection would mean that the Court would be less willing to supply justifying rationales by exercising its imagination. It would have the Court assess the means in terms of legislative purposes that have substantial basis in actuality, not merely in conjecture. Moreover, it would have the Justices gauge the reasonableness of questionable means on the basis of materials that are offered to the Court, rather than resorting to rationalizations created by perfunctory judicial hypothesizing. [Gunther, *supra* at 20–21].

candidates.[7] This infringement, while not sufficient to invoke the most stringent standard of judicial review, certainly calls for the application of a *strengthened* "rational relation" test.

None of the cases cited by the majority is inconsistent with this approach. In *Manson v. Edwards, supra,* 482 *F.* 2d at 1077 (involving a provision in the Detroit Charter requiring city councilmen to be at least 25 years old), the court noted that "the correct method of analysis for issues of this character" was set forth in *Bullock v. Carter.* The court then concluded, as I have done here, that the case should be remanded for a plenary hearing as to whether there is a rational basis for the charter's classification:

In the present case, however, we do not pass upon the issue of the validity or invalidity of the charter provision under the rational basis test. There is no evidence in the record on this question. [482 *F.* 2d at 1078].

In other cases cited by the majority, including *Human Rights Party v. Secretary of State, supra* (challenging a statute which excluded persons under 18 years of age from serving on local school boards); *Blassman v. Markworth, supra* (challenging a statute which set minimum age for school board membership at 21 years) and *Whitehead v. Westbrook, supra* (attacking a statute which set minimum age qualification for the office of city director), the federal courts have upheld various age restrictions by rejecting plaintiffs' contention that classifications on the basis of age must be justified by a "compelling state interest." In none of these cases, however, did plaintiffs argue that a strengthened "rational relation" test was the appropriate standard and therefore a full evidentiary hearing was required. Consequently, these cases provide only limited guidance for our

---

[7]This figure increases substantially if one considers the fact that the Constitution of 1947 also denies the right to run for the State Senate to all adults between the ages of 18 and 30.

present purposes. In fact, in confronting equal protection challenges to minimum age requirements, these courts have consistently recognized that such restrictions on the right to run for public office are not immune from the impact of the Equal Protection clause. See *e. g., Blassman v. Markworth, supra,* 359 *F. Supp.* at 3.

## II

This case comes before us after a hearing on cross-motions for summary judgment. *R.* 4:46–2. It is well settled that one of the functions of this procedural device is to protect parties against "groundless claims and frivolous defense[s]." *R.* 4:46–1 *et seq., Robbins v. Jersey City,* 23 *N. J.* 229, 241 (1957). Consequently, summary judgment will be granted where no issues of fact exist. *Judson v. Peoples Bank and Trust Co. of Westfield,* 17 *N. J.* 67, 75 (1954). In light of these considerations, it is clear that a grant of summary judgment for defendant must be supported by an uncontroverted finding that there is "an appropriate governmental interest suitably furthered by the differential treatment." Gunther, *supra,* 86 *Harv. L. Rev.* at 17, quoting from *Chicago Police Dept. v. Mosley, supra,* 408 *U. S.* at 95, 92 *S. Ct.* at 2290, 33 *L. Ed.* 2d at 216. The majority identifies the "appropriate governmental interest" in the instant case as maintaining the integrity of the ballot by assuring the overall maturity and competence of candidates. *Ante* at 403–405. The question remains whether the distinction between 18-year-olds and 21-year-olds "suitably furthers" that interest.

During the hearing on these cross-motions, counsel for plaintiffs offered to prove to the court by submission of expert testimony that "there is no rational basis at all for that distinction" which is represented by the constitutional age requirements. Counsel for defendant argued to the contrary, that the age classifications contained in the challenged provision are reasonably related to the governmental purpose. The trial judge, without the benefit of a plenary hearing, held

that the age classifications are reasonably related to the State's purpose. "The role of the judge (in ruling upon motions for summary judgment) is to determine whether there is a genuine issue as to a material fact, *but not to decide the issue* if he finds it to exist." *Judson v. Peoples Bank and Trust Co. of Westfield, supra,* 17 *N. J.* at 73 (emphasis supplied). Contrary to the proscription in *Judson,* the trial judge found as a fact that minimum age requirements insure that candidates will be more mature, more experienced, more politically stable and better able to perform the duties of public office.

In affirming the trial court's decision to grant summary judgment, my Brothers in the majority impliedly adopt these findings as a matter of judicial notice. In addition, they expressly find that the exclusion of 18, 19 and 20-year-olds will maintain "the integrity of the ballot by ensuring competent candidates." This statement implies that there is some rational basis for concluding that 18-year-olds are less competent and less mature than 21-year-olds.

I am satisfied that plaintiffs have raised a genuine issue of fact in this regard. Because of the significance of the right involved in this case and in light of the evidence supporting plaintiffs' contention (*see infra,* Part III), it is my view that both motions for summary judgment should have been denied. Moreover, plaintiffs should have been afforded the opportunity to establish by competent proofs their contention that "there is no rational basis" for the distinction between 18 and 21-year-olds.

### III

A new look at the age requirements of candidates for the State Senate and State Assembly is long overdue. Much has occurred since New Jersey first adopted these minimum age requirements in 1844. The proofs offered by plaintiffs provide persuasive evidence of this. For example, the 18 to 20 age group is now better educated than its predecessors.

More than 50% of all 18, 19, 20 and 21-year-olds now receive some higher education; 80% of that age group receive high school diplomas. In contrast, during the 1920's less than 10% of that same age bracket went to college and, more surprisingly, less than 20% were high school graduates. According to the Bureau of Census, the median of number of years in school for 18 and 19 year-olds today is 12.2, while the median for persons between the ages of 65 and 75 is 8.8 years.

Plaintiffs assert that their experts, which include the social anthropologist Dr. Margaret Mead, would testify at trial that the age of maturity has been decreasing steadily. Young people are assuming greater responsibilities at an earlier age. Of approximately 11 million individuals in the 18 to 21-year-old bracket, nearly 50% are married, 1 million have families and nearly 3 million have served or are serving in the armed forces. Moreover, this Court has expressly recognized that college students, most of whom are within the 18 to 21 age bracket, have exhibited a keen awareness of the political world; they enthusiastically participate in political campaigns and keep themselves informed as to national, state and local affairs:

* * * So far as the informed electorate is concerned the college students have already indicated that they will more than hold their own; they have displayed special awareness in the political sphere, have actively participated in political campaigns, and have kept themselves thoroughly informed through public as well as college news coverage. Their interests have not been confined to federal matters but have extended to state and local matters. In this regard it may be noted that the Senate Report, *supra* at 12, which preceded the twenty-sixth amendment explicitly pointed out that if the energy and idealism of the young are needed in election politics, "they are needed no less at the State and local level" and that their participation in state and local elections is indeed appropriate since they are particularly concerned with matters of state and local policy including, *inter alia*, "the quality of education at all levels; the state of the environment; planning and community development." See *Jolicoeur v. Mihaly, supra* [5 *Cal.* 3d 565, 96 *Cal. Rptr.* 697], 488 *P.* 2d 1 at 6. [*Worden v. Mercer Cty. Bd. of Elections*, 61 *N. J.* 325, 347 (1972)].

Similarly, in *N. J. State P. B. A. v. Morristown,* 65 *N. J.* 160 (1974), we quoted from one study which stated that:

\* \* \* "[M]*ost young people today mature earlier than in the past*" and that "*by 18 most young people are ready for these responsibilities and rights and would greatly profit by them as would . . . the community as a whole. . . .*" (Emphasis added). *Lately Report, supra* at 125. [65 *N. J.* at 171].

On the basis of such findings, we concluded that:

[The persons in the 18 to 21 age group] have demonstrated their enthusiasm, their open-mindedness and their refreshing viewpoints. This will bring them further into the political process. The gap between the "Nation's ideals and actions" will narrow. They will have a further "responsible stake in the future of the Nation." To deny that which is deserved is to spawn frustration and rebellion. [65 *N. J.* at 171].

Accordingly, since 1844, the legal rights and responsibilities of 18 to 21-year-olds have undergone rapid expansion. In most states, individuals in that age bracket now have the right to contract, to marry, to own guns, to become presidential electors, to select party nominees, to be held responsible for criminal behavior, and to exercise the right to vote. In New Jersey, these rights were conferred upon 18, 19 and 20-year-olds in 1972 through passage of *N. J. S. A.* 9:17B–1 *et seq.*[8] In *N. J. State P. B. A. v. Morris-*

---

[8]*N. J. S. A.* 9:17B–1 provides, in part:

The Legislature finds and declares and by this act intends, pending the revision and amendment of the many statutory provisions involved, to:

a. Extend to persons 18 years of age and older the basic civil and contractual rights and obligations heretofore applicable only to persons 21 years of age or older, including the right to contract, sue, be sued and defend civil actions, apply for and be appointed to public employment, apply for and be granted a license or authority to engage in a business or profession subject to State regulation, serve on juries, marry, adopt children, attend and participate in horse race meetings and parimutuel betting and other legalized games and gaming, sell, purchase and consume

*town, supra,* we had an opportunity to review that statute. There we held that this law superseded a more specific statute which prohibited the hiring of persons under the age of 21 years as policemen. We also noted that in addition to lowering the age of majority, the statute reduced the minimum age requirements of numerous laws relating to professional certification and licensure from 21 to 18 years of age. 65 *N. J.* at 168 n. 5.

Notwithstanding these developments, defendant argues that the minimum age requirements imposed by *N. J. Const.* (1947), Art. IV, § I, ¶ 2 serve to insure a certain stability of political viewpoint. Plaintiffs respond to this argument by asserting that after the passage of the twenty-sixth amendment to the United States Constitution, the polls demonstrated that the voting tendencies of 18, 19 and 20 year-olds closely paralleled those of the remainder of the electorate. Moreover, in response to defendant's concern about plaintiffs' fitness for office, this Court has expressly held that ". . . individual fitness is something the voters decide . . . . The Legislature cannot take that issue from them." *Gangemi v. Rosengard, supra* 44 *N. J.* at 174.

Finally, while I recognize the legitimacy of some age limitations, *ante* at 404–405, the fact that our forefathers deemed it wise in 1788 to establish minimum age requirements of 30 and 25 years for members of the United States Senate and the House of Representatives, respectively, does not necessarily resolve the question whether New Jersey's age restrictions are rationally related to a legitimate state purpose in 1976. See *Manson v. Edwards, supra,* 482 *F.* 2d at 1078–79.

---

alcoholic beverages act as an incorporator, registered agent or director of a corporation, consent to medical and surgical treatment, execute a will, and to inherit, purchase, mortgage or otherwise encumber and convey real and personal property.

b. Abolish the right of a person between the ages of 18 and 21 years to disaffirm and be relieved of contractual obligations by reason of age.

## CONCLUSION

There is no talismanic magic to the age 21. It appears that the differences between mature 18-year-olds and persons 21 years of age and older are minimal in terms of maturity, competency, intelligence and experience. Because 18 is now the age of majority, it seems reasonable to use that age as the line of demarcation in establishing qualifications for candidacy. Youths today mature at a chronologically earlier point in their lives than did their predecessors and this maturity could redound to the benefit of the entire community. The enthusiasm and vigor of this age group are evident. The refreshing viewpoints of these young adults may supply answers to problems which today appear insoluble.

It seems ludicrous that in a state where young adults have been accorded innumerable rights, privileges and responsibilities, they should still be denied the right to be members of the State Assembly and the State Senate. Free access to political office is essential to our democratic society. *Gangemi v. Rosengard, supra,* 44 *N. J.* at 170–71. In this bicentennial year, the freedom to run for public office is a right which should not be taken lightly. Two million possible candidates between the ages of 18 and 29 cannot offer themselves as candidates due to these age restrictions. This constitutes a massive void. Society at large sorely needs the benefit of new, youthful voices.

We must remember that plaintiffs' concern in the instant case is simply to exercise their right to offer themselves as candidates for office. I am, of course, cognizant of the fact that this right, whatever its constitutional dimensions, should not be confused and is not synonymous with election to office. That achievement ultimately resides within the franchise granted to the electorate. Nonetheless, I am persuaded that the opportunity for an 18-year-old to be elected is better left to the vagaries of an open and free election than to the arbitrary operations of a constitutional prohibition whose underlying justification is dubious at best.

The age requirements of *N. J. Const.* (1947), Art. IV, § I, ¶ 2 represent manifestations of by-gone days which fail to comport with reality.

For these reasons, I would reverse and remand for a plenary hearing.

*For affirmance*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, CLIFFORD and SCHREIBER and Judge CONFORD—6.

*For reversal and remandment*—Justice PASHMAN—1.