696 A.2d 1134

GERALD MCCANN, PLAINTIFF, v. SUPERINTENDENT OF
ELECTIONS OF HUDSON COUNTY AND CLERK OF
THE CITY OF JERSEY CITY, DEFENDANTS.

Superior Court of New Jersey
Chancery Division
Hudson County

Decided April 4, 1997.

*Jan Alan Brody,* for plaintiff (*Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein,* attorneys).

*Mark J. Fleming,* Assistant Attorney General for defendant Superintendent of Elections (*Peter Verniero,* Attorney General of New Jersey).

D'ITALIA, A.J.S.C.

The issue before the Court is whether *N.J.S.A.* 19:4–1(8), which denies suffrage to any person "[w]ho is serving a sentence or is on parole or probation as the result of any indictable offense under the laws of this or another state or of the United States" applies to a person on "supervised release" pursuant to the sentence of a federal court.

This action was instituted by Gerald McCann, a former mayor and current candidate for Mayor of the City of Jersey City. In December 1991, McCann was convicted in the United States District Court for the District of New Jersey on fifteen counts of mail fraud, wire fraud, false statements to a bank, false statements to the Internal Revenue Service, income tax evasion and failure to file a tax return.

As a result of his conviction, McCann could not complete his term as Mayor. By order of this court dated February 7, 1992, on motion of the Attorney General of New Jersey, his position as Mayor was declared forfeit pursuant to *N.J.S.A.* 2C:51–2(a)(1). That statute provides for the forfeiture of any public office in this state upon conviction of an offense involving dishonesty or a crime of the third degree or above or the conviction of an equivalent offense under federal law.

McCann was sentenced by the Hon. John C. Lifland, U.S.D.J., on June 24, 1992. On several counts, he was sentenced under the pre–1987 federal guidelines to concurrent terms of thirty-three months each. With respect to these counts, he was eligible for parole after eleven months. On four counts, McCann was sentenced under the 1987 federal sentencing guidelines, pursuant to

which parole was inapplicable, having been abolished. McCann was sentenced on each of these four counts to thirty-three months imprisonment and, upon release from imprisonment, supervised release for a term of three years, all sentences to run concurrently. McCann actually served twenty eight and one-half months imprisonment and was released to a halfway house in October 1994. In February 1995, he was released from imprisonment and commenced to serve the supervised release part of his sentence. His supervised release will terminate in about February 1998.

McCann had originally registered to vote in Hudson County on September 26, 1973. As a result of his conviction and sentence, McCann's registration was removed from the active file by the Hudson County Superintendent of Elections. *See N.J.S.A.* 19:31–17. McCann re-registered as a Hudson County voter on September 19, 1995. The Superintendent has certified that McCann's re-registration was accepted without objection because she was unaware of his status as a supervised releasee. Since then, McCann has voted in the November 1995 County Executive election, the April 1996 Jersey City School Board election, the June 1996 presidential primary, and the November 1996 presidential election.

In February 1997, McCann announced that he was running for Mayor of Jersey City. On March 24, 1997, McCann was advised by the City Clerk that his nominating petitions included the required number of signatures and that his name would appear on the ballot for the May 13, 1997 election. In the interim, the Superintendent had come into possession of a copy of McCann's judgment of conviction and learned that he was serving the supervised release term of his sentence. She sought the advice of the Attorney General. By letter dated March 24, 1997, the Attorney General advised the Superintendent that the federal supervised release program "is substantially equivalent to parole" and is, therefore, "a criminal disqualification barring eligibility for voter registration and the exercise of the franchise." The letter concluded that "McCann is neither entitled to register to vote nor

eligible to vote and that his registration records should be removed from active status", citing *N.J.S.A.* 19:4–1 and 19:31–17.

On about March 31, 1997, the Superintendent complied with the Attorney General's direction. *N.J.S.A* 10:1.1 provides that the right of a citizen of this State to hold office is coextensive with the right to vote.[1] Thus, the removal of McCann's registration disqualified him as a mayoral candidate. The drawing for ballot positions for the mayoral election was scheduled for April 1, 1997. On March 31, 1997, McCann instituted this action to retain his status as a registered voter. This court entered an order of temporary restraint restoring McCann to the list of registered voters and delaying the drawing for ballot positions until today.

The denial of suffrage is a matter of extreme gravity, made more so in this case because of its consequential effect of disqualifying McCann in his bid to be reelected as mayor and denying the voters of the City the opportunity to cast their ballots for him. More significantly, the position taken by the Attorney General disenfranchises all those persons otherwise qualified to vote who are now or will in the future be under sentence for a term of supervised release. The record is silent regarding how supervised releasees have been treated by voter registration authorities for the near decade that the program has been in existence.[2]

The issue before the Court is one of statutory construction: whether serving a term of supervised release constitutes "serving

---

[1] *N.J.S.A.* 40A:9–1.13 provides that no person shall be eligible to become a candidate for any local elective office unless registered to vote in the local unit to which the office pertains.

[2] The Assistant Attorney General charged with responsibility for this matter has represented on the record that McCann's registration is the very first occasion that the Attorney General has had to consider the question whether a supervised releasee is eligible to vote. While that seems unlikely at first blush, the supervised release program applies only to offenses committed after November 1, 1987. How many New Jersey residents have voted or attempted to vote while on supervised release since then is unknown. The Attorney General made no effort to canvass county officials charged with maintaining voter records to determine how they may have dealt with the issue, if at all.

a sentence" or being "on parole" within the contemplation of *N.J.S.A.* 19:4–1(8). The issue cannot be addressed without explicit recognition of the importance of the right abrogated by the election law. In *Gangemi v. Rosengard,* 44 *N.J.* 166, 170, 207 *A.*2d 665 (1965), Chief Justice Weintraub wrote:

> Thus, despite an impoverished beginning, the right to vote has taken its place among our great values. Indeed the fact that the voting franchise was hoarded so many years testifies to its exalted position in the real scheme of things. It is the citizen's sword and shield. 'Other rights, even the most basic, are illusory if the right to vote is undermined.' [citation omitted] It is the keystone of a truly democratic society.
>
> And the right to vote would be empty indeed if it did not include the right of choice for whom to vote.

Nonetheless, the right to vote is not absolute. The New Jersey Constitution establishes voter qualifications and, in Article 2, par. 7, provides that: "The Legislature may pass laws to deprive persons of the right of suffrage who shall be convicted of such crimes as it may designate." *N.J. Const.* art. II, ¶ 7.

Given the exalted nature of the voting franchise, it is appropriate that legislation in derogation of that right be narrowly construed. Stated otherwise, "election laws must be liberally construed to effectuate the overriding public policy in favor of the enfranchisement of voters." *Afran v. County of Somerset,* 244 *N.J.Super.* 229, 232, 581 *A.*2d 1359 (App.Div.1990). Nonetheless, even "strict construction does not mean that manifestations of the Legislature's intention should be disregarded." *State v. Edwards,* 28 *N.J.* 292, 298, 146 *A.*2d 209 (1958). All rules of construction are subordinate to the goal of determining legislative intent. *State v. Provenzano,* 34 *N.J.* 318, 322, 169 *A.*2d 135 (1961). Our Supreme Court has made clear that, in resolving problems of legislative intent, the approach cannot be the mere mechanical selection and application of a canon or maxim of statutory construction and the mouthing of it as the reason for the result reached. Our approach should be "to seek the sense of the situation." *Clifton v. Zweir,* 36 *N.J.* 309, 323, 177 *A.*2d 545 (1962). The task of the court is "to determine what sensible legislators would wish that a court should do," *Johns–Manville Prods. Corp. v. Dronebarger,* 211 *N.J.Super.*

520, 525, 511 *A.*2d 1304 (Law Div.1986) or, as stated more eloquently by Judge Cardozo:

When all the world can see what sensible legislators in such a contingency would wish that we should do, we are not to close our eyes as judges to what we must perceive as men.

*People ex rel. Alpha Portland Cement Co. v. Knapp,* 230 *N.Y.* 48, 63, 129 *N.E.* 202, 208 (Ct. of App.1920, *cert. den. sub nom. State Tax Com'r v. People of State of New York ex rel. Alpha Portland Cement Co.,* 256 *U.S.* 702, 41 *S.Ct.* 624, 65 *L.Ed.* 1179 (1921)

■ The sense of the situation obliges this court to conclude that the Legislature intended to deny suffrage to all persons serving the supervised release component of a sentence for conviction of a federal indictable offense. Supervised release subjects the offender to a post incarceration series of conditions for a specific term, the violation of which places the offender at risk of reincarceration. It is in all significant respects the equivalent of parole.

Supervised release is a sentencing option accorded to federal judges by the Sentencing Reform Act, 18 *U.S.C.A.* § 3551 to 3673. It applies to federal offenses committed after November 1, 1987. The Act evolved from Congress' dissatisfaction with a system of indeterminate sentencing supplemented by utilization of the parole system to determine when an offender should be returned to society under the guidance and control of a parole officer. *Mistretta v. U.S.,* 488 *U.S.* 361, 109 *S.Ct.* 647, 102 *L.Ed.*2d 714 (1989). The perceived flaws in the system were unwarranted disparity in sentencing and uncertainty about the length of time offenders would spend in prison. *See,* S.Rep. No. 225, 98th Cong., 2d Sess. (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3232 [hereinafter *Report* ]. These were the result in large measure of the division of authority between the sentencing judge and the parole officer, who often worked at cross purposes. *Ibid; Mistretta, supra,* 488 *U.S.* at 366, 109 *S.Ct.* at 652, 102 *L.Ed.*2d at 727. Congress responded with a system of sentencing that eliminated the early release of offenders on parole but added a requirement that the judge, at time of sentencing, decide whether a defendant sen-

tenced to a term of imprisonment will need post release supervision and what the conditions of that release should be. *Report, supra,* at 3239.

Thus, 18 *U.S.C.A.* § 3583(a) provides that the court, in imposing a sentence to a term of imprisonment for a felony or misdemeanor, may include as part of the sentence a requirement that the defendant be placed on a term of supervised release after imprisonment. For Class A or Class B felonies, the term of supervised release should not exceed five years. For Class C or D felonies, the maximum term of supervised release is three years. 18 *U.S.C.A.* § 3583(b). The Court order is required to state as an explicit condition of supervised release that the defendant not commit another crime during the term of supervision and that he submit to a drug test within fifteen days of release and at least two periodic drug tests thereafter. The court may impose as additional conditions any of the broad panoply of discretionary conditions applicable to probation and any other condition it considers to be appropriate. The court may revoke a term of supervised release and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release without credit for time previously served on post release supervision. 18 *U.S.C.A.* § 3583(e).

A prisoner whose sentence includes a term of supervised release after imprisonment is released to the Bureau of Prisons to the supervision of a probation officer who, during the term imposed, supervises the offender to the degree warranted by the conditions specified by the sentencing court. 18 *U.S.C.A.* § 3624(e).

There can be no argument with the fact that a supervised releasee is "serving a sentence." McCann argues, however, that those words must be understood in the context of *N.J.S.A.* 19:4–1(8) to mean "serving a sentence of incarceration" else the additional references to probation and parole are rendered surplusage. Such a restrictive reading is neither required nor appropriate. The phrase "serving a sentence" has an independent, plain and

common meaning inclusive of a variety of sentencing options. The restrictive interpretation for which McCann argues could have been expressed clearly and succinctly by the Legislature had that been its intent. "It is a settled rule of statutory construction that if the language chosen by the legislature is plain and the result is not contrary to obvious legislative intent, 'the sole function of the court is to enforce it according to its terms'." *State v. Maguire,* 84 *N.J.* 508, 528, 423 *A.*2d 294 (1980) (*quoting, Sheeran v. Nationwide Mutual Ins. Co., Inc.,* 80 *N.J.* 548, 556, 404 *A.*2d 625 (1979). The Legislature could have said, "No person shall have right of suffrage who is incarcerated, or is on parole or probation." It did not choose those words.

■  At bottom, statutes are to be interpreted in a manner that "effectuate[s] the legislative intent in light of the language used and the objects sought to be achieved." *Id.* at 514, 423 *A.*2d 294. New Jersey has a history of denying suffrage to felons dating back at least to its 1844 Constitution. *See, Stephens v. Yeomans,* 327 *F.Supp.* 1182 (D.N.J.1970). The purpose of disenfranchisement has to do with maintaining the purity of the electoral process. *Ibid.; Application of Marino,* 23 *N.J.Misc.* 159, 42 *A.*2d 469 (Com.Pl.1945). Thus, the objective of the Legislature must be seen as excluding from the electoral process those deemed untrustworthy, i.e., persons under sentence for an indictable offense, whether on probation, parole, or the equivalent of those programs under the laws of another jurisdiction.[3]  McCann's status as one under federal sentence of supervised release on a host of indictable offenses falls within the ambit of legislative intent.

---

[3] *Hitchner v. Cumberland County Bd. Of Elections,* 163 *N.J.Super.* 560, 395 *A.*2d 270 (Cty.Ct.1978) held that an offender sentenced to a term of imprisonment was permitted to vote at an election that occurred prior to his surrender date. The result seems inconsistent with the legislative purpose. Why would the Legislature intend to disenfranchise an offender who has had the rehabilitative benefits of incarceration, such as they might be, and who is in transition back to community life under supervision (parole) but not intend to disenfranchise the sentenced offender on route to prison? Excessively narrow readings of legislation can lead to anomalous results.

This conclusion is reinforced by examination of the nature of supervised release and its kinship with parole. First, however, disposition must be made of McCann's argument that supervised release, being unknown at the time the election law was amended in 1971, could not have been within the contemplation of the Legislature. The argument would be stronger had parole been abolished by the Congress prior to our Legislature's 1971 amendment to the election laws. The failure in that circumstance to address a significant modification of the federal sentencing scheme would be of arguable moment. As it stands, however, the abolition of federal parole and the introduction of supervised release sixteen years after the amendment to *N.J.S.A.* 19:4–1 requires invocation of the doctrine of probable intent. In *AMN, Inc. v. South Brunswick Tp. Rent Leveling Bd.*, 93 *N.J.* 518, 525, 461 *A.*2d 1138 (1983) our Supreme Court held:

> [W]here it is clear that the drafters of a statute did not consider or even contemplate a specific situation, this Court has adopted as an established rule of statutory construction the policy of interpreting the statute "consonant with the probable intent of the draftsmen 'had he anticipated the situation at hand.' " [citations omitted]. Such an interpretation will not "turn on literalisms, technisms or the so-called rules of interpretation; [rather] it will justly turn on the breadth of the objectives of the legislation and the commonsense of the situation." SU22◻[citation omitted]

The doctrine is consonant with the proposition that "the reach of a statute is not limited to situations existing at the time of its adoption." *Amerada Hess Corp. v. Div. of Tax.*, 107 *N.J.* 307, 336, 526 *A.*2d 1029 (1987), *aff'd*, 490 *U.S.* 66, 109 *S.Ct.* 1617, 104 *L.Ed.*2d 58 (1989).

Returning to an examination of supervised release and parole or, for that matter, probation, it is clear that their differences are, in many ways, formal and technical. A New Jersey parolee remains in the legal custody of an executive branch official, the Commissioner of Corrections; the Parole Board determines release date and adjudicates violations of the conditions of release. A federal releasee is under the supervision of a probation officer, who is in the judicial branch. Violations are determined by the sentencing judge. Parole serves to reduce time spent in prison

but does not shorten the term of the sentence. Where parole is revoked, the parolee receives credit for street time; the term of the sentence is not lengthened. *See generally,* "Parole Act of 1979," *N.J.S.A.* 30:4–123.45 to 30:4–123.69. Supervised release is punishment in addition to the term of incarceration; it is imposed at the time of sentence. Revocation may result in the term of supervised release being converted to a custodial term without credit for street time. 18 *U.S.C.A.* § 3583(e)(3). It is, in that respect, more onerous than parole.

In their purpose and impact on the lives of those sentenced, the differences between parole and supervised release are insubstantial. Both are periods of restricted freedom subsequent to a period of incarceration during which time the offender is under supervision and must comply with a number of conditions at peril of being reincarcerated. Probation is similar. It need not follow a period of incarceration, but under New Jersey's split sentencing scheme frequently does.

The Senate Report on the Sentencing Reform Act states:

> In effect, the term of supervised release provided by the Bill, takes the place of parole supervision under current law. Unlike current law, however, probation officers will only be supervising those releasees from prison who actually need supervision, and every releasee who does need supervision will receive it. The term of supervised release is very similar to a term of probation, except that it follows a term of imprisonment and may not be imposed for purposes of punishment or incapacitation since those purposes will have been served to the extent necessary by the term of imprisonment.
>
> [*Report, supra,* at 3308]

It is interesting to compare this statement and the mandatory conditions attached to supervised release with *N.J.S.A.* 30:4–123.53(a), which provides that the likelihood of future criminal conduct is the determinative factor in deciding parole eligibility and *N.J.S.A.* 30:4–123.59(b) which provides that parole conditions shall include, among other things, that a parolee comply with all laws and refrain from committing any crime. New Jersey Bureau of Parole Internal Standard 101.1 states that parole:

> ... is a penalogical measure designed to facilitate the transition of the offender from the highly controlled life of the penal or correctional institution to the

freedom of community living. It is not intended as a gesture of leniency or forgiveness. It also involves a particular kind of supervision involving guidance and assistance which sets it apart from typical police functions. * * * Parole offers a means of protection to society from further criminal activity on the part of the parolee.

Descriptions of supervised release echo these concepts. In *United States v. Vallejo,* 69 *F.3d* 992, 994 (9th Cir.1995), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 1447, 134 *L.Ed.2d* 567 (1996), the Court stated:

[T]he purpose of supervised release [is] to protect the public and 'to facilitate the reintegration of the defendant into the community....' United States Sentencing Commission, *Guidelines Manual* § 5D1.1 comment (n. 2) (Nov.1992). *See also* USSG § 5D1.3(b)(2) (stating that supervised release conditions may be imposed 'to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.')

Finally, in *United States v. Paskow,* 11 *F.3d* 873, 882 (9th Cir.1993), the Court of Appeals held that "there is no difference for *ex post facto* purposes between parole and supervised release. Each is a component of the defendant's sentence." The Court's conclusion was based upon its findings that:

Supervised release and parole are virtually identical systems. Under each, a defendant serves a portion of a sentence in prison and a portion under supervision outside prison walls. If a defendant violates the terms of his release, he may be incarcerated once more under the terms of his original sentence. More specifically, a defendant's original sentence determines the length of the term of parole (indirectly) or supervised release (directly). It is also the original sentence that establishes how long the defendant may be required to serve following revocation in the case of both parole and supervised release violations. Finally, it is the original sentence that is executed when the defendant is returned to prison after a violation of the terms of both parole and supervised release.

[*Id.* at 881 (footnote omitted) ].

The common sense of the situation is clear. Parole and supervised release are functional equivalents for purposes of the application of *N.J.S.A.* 19:4–1(8). Allowing supervised releasees to avoid the onus which the statute places on any person who is serving a sentence or is on parole or probation as the result of any indictable offense under the laws of this state or of the United States subverts the legislative intent. Not every person convicted

under federal law receives a term of supervised release in addition to a term of incarceration—only those whom the judge determines require it. It would be anomalous to conclude that those offenders singled out for this treatment may avoid consequences attendant upon parolees.

Plaintiff's claim of selective enforcement is unsupported. It appears that the Attorney General has never considered the issue before the court until McCann's candidacy brought it to the fore. There is no evidence of the existence of a deliberate policy of non-enforcement. *Abrahams v. Civil Service Commission,* 65 *N.J.* 61, 74–75, 319 *A.*2d 483 (1974).

Plaintiff's order to show cause is discharged. Restraints previously imposed are vacated. The complaint is dismissed.