770 A.2d 723 (2001)
Gerald McCANN, Plaintiff-Respondent,
v.
CLERK OF THE CITY OF JERSEY CITY, Defendant-Respondent, and
Louis Manzo, Intervenor-Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued telephonically March 29, 2001.
Decided April 3, 2001.
*725 Karen F. DeSoto, for intervenor-appellant Louis Manzo.
Samuel R. DeLuca, Jersey City, for respondent Gerald McCann, (DeLuca & Taite, attorneys; Mr. DeLuca, on the brief).
Sean M. Connelly, City Counsel of Jersey City, submitted a letter brief regarding emergent relief.
Before Judges PETRELLA, NEWMAN and BRAITHWAITE.
*724 The opinion of the court was delivered by PETRELLA, P.J.A.D.
This appeal involves the eligibility of plaintiff Gerald McCann to be a candidate for Mayor of the City of Jersey City, a Faulkner Act municipality, in the impending May 8, 2001 election in Jersey City. See N.J.S.A. 40:69A-1 et seq. It is before us on an accelerated basis on the application of intervenor-defendant Louis Manzo, one of five rival candidates for the office of mayor. After the appeal was filed on March 29, 2001, plaintiff McCann moved for summary disposition and acceleration of the appeal. The focus of the appeal is the applicability of the Forfeiture Statute, N.J.S.A. 2C:51-2, and the somewhat parallel Faulkner Act forfeiture provision in N.J.S.A. 40:69A-166.
We conclude that each statutory provision independently bars McCann's candidacy, and we reverse and remand for entry of an order removing his name from the ballot.
It is undisputed that McCann, while in office as Mayor of Jersey City in 1991,[1] was convicted in the United States District Court for the District of New Jersey of fifteen counts of mail fraud, wire fraud, false statements to a bank, false statements to the Internal Revenue Service, income tax evasion, and failure to file a tax return. See McCann v. Superintendent of Elections of Hudson County, 303 N.J.Super. 371, 696 A.2d 1134 (Ch.Div.), aff'd, 303 N.J.Super. 352, 696 A.2d 1124 (App.Div.), certif. denied, 149 N.J. 139, 693 A.2d 109 (1997). Although the sparse record submitted to us permits no definite statement as to the type and time of each of the acts, much, if not all of the conduct giving rise to his convictions occurred prior to the term in which McCann was mayor. McCann's conviction on several counts resulted in his being sentenced to concurrent thirty-three month terms of imprisonment. The convictions were affirmed. See U.S. v. McCann, 6 F.3d 781 (3d Cir.1993) (table); 993 F.2d 226 (3d Cir.1993) (table).
The New Jersey Attorney General sought and obtained an order under N.J.S.A. 2C:51-2(a) declaring that McCann had forfeited his office based on his 1991 convictions of crimes involving dishonesty or crimes of a third degree or higher while he was in office.
McCann was discharged from federal prison in 1995 and began serving the supervised release part of his sentence. In *726 February 1997, while on supervised release, McCann sought to be a candidate for the office of Mayor of Jersey City. In McCann v. Superintendent of Elections, supra, 303 N.J.Super. 371, 696 A.2d 1134, he was declared disqualified from voting while still under sentence and, hence, his candidacy was invalidated.
After serving his sentence completely, and with voting rights restored, McCann sought to file a petition with the City Clerk of Jersey City in February 2001 as a candidate for mayor in the May 8, 2001 election. Under the Faulkner Act the election is nonpartisan. Based on advice from Jersey City's Corporation Counsel, the City Clerk refused to process the petitions nominating McCann as a candidate on the ground that his 1991 convictions involved fraud, and fraud on a government entity, in particular the Internal Revenue Service, and touched upon his office. The City Clerk took the position that under both the Forfeiture Statute and the forfeiture provisions in the Faulkner Act, N.J.S.A. 40:69A-166, McCann was forever disqualified from holding office.
McCann filed suit against the City Clerk challenging his disqualification and seeking a declaratory judgment that he is eligible to run for the office of Mayor of Jersey City. Based on a rather sparse record and presumably on undisputed facts, the Law Division Judge, relying in part on State v. Musto, 187 N.J.Super. 264, 454 A.2d 449 (Law Div.1982), aff'd. o.b., 188 N.J.Super. 106, 456 A.2d 114 (App.Div. 1983), concluded that the sanction of being "forever disqualified from holding any office" in the forfeiture provisions of the Penal Code, N.J.S.A. 2C:51-2, did not apply to McCann at this time because the acts that formed the underlying predicate for the offenses for which he was convicted were committed during a period when he was not serving as mayor. The judge concluded that although forfeiture of office may have been required for the balance of his term of office, permanent disqualification from holding office was not. It is undisputed that his convictions of those offenses while in office warranted his removal from office, and that he was removed. In addition, the judge held that the alternative forfeiture provision stating that a "person convicted of a crime or offense involving moral turpitude shall be ineligible to assume any public office" in N.J.S.A. 40:69A-166, although facially applicable, was unconstitutional[2] as a violation of equal protection, and thus, did not provide any impediment to McCann's petition.

I.
We first consider whether the general Forfeiture Statute (N.J.S.A. 2C:51-2) operates to forever disqualify McCann from public office.
N.J.S.A. 2C:51-2a provides:
A person holding any public office, position, or employment, elective or appointive, under the government of this State or any agency or political subdivision thereof, who is convicted of an offense shall forfeit such office or position if:
(1) He is convicted under the laws of this State of an offense involving dishonesty or of a crime of the third degree or above or under the laws of another state or of the United States of an offense or a crime which, if committed in this State, would be such an offense or crime;

*727 (2) He is convicted of an offense involving or touching such office, position or employment; or
(3) The Constitution or a statute other than the code so provides.[3]
Subdivision 2d of this statute provides:
In addition to the punishment prescribed for the offense, and the forfeiture set forth in subsection a. of N.J.S.A. 2C:51-2, any person convicted of an offense involving or touching on his public office, position or employment shall be forever disqualified from holding any office or position of honor, trust or profit under this State or any of its administrative or political subdivisions.
It is not disputed that conviction of an offense "involving or touching" any public office, position, or employment results in forfeiture. N.J.S.A. 2C:51-2a(2). The statute goes on to provide that "any person convicted of an offense involving or touching on his public office, position or employment shall be forever disqualified from holding any office" under the State or any of its subdivisions. N.J.S.A. 2C:51-2d. The key inquiry is whether the forfeiture of office and disqualification from public employment provisions apply to "forever bar" McCann from public office even where the offenses underlying the conviction while in public office were committed before he was in public office.
Our overriding goal is to determine the Legislature's intent. See Mayfield v. Community Medical Associates, 335 N.J.Super. 198, 204, 762 A.2d 237 (App.Div.2000). We begin this task by examining the wording of the statute to ascertain its plain meaning. Briarglen II Condo. v. Tp. of Freehold, 330 N.J.Super. 345, 353, 749 A.2d 881 (App.Div.), certif. denied, 165 N.J. 489, 758 A.2d 648 (2000). As our Supreme Court stated in Cornblatt v. Barow, 153 N.J. 218, 231, 708 A.2d 401 (1998), "[o]rdinarily, the language of the statute is the surest indicator of the Legislature's intent." However, while the language of the Forfeiture Statute is simple and direct, its meaning is not.
Recently the Court discussed the intended purpose behind the Forfeiture Statute in Cedeno v. Montclair State University, 163 N.J. 473, 477, 750 A.2d 73 (2000), stating:
The legislative intent of the Forfeiture Statute is "`to preclude those who have once violated the public trust from [having] a second opportunity.'" Pastore v. County of Essex, 237 N.J.Super. 371, 377, 568 A.2d 81 (App.Div.1989) (quoting State v. Musto, 187 N.J.Super. 264, 314, 454 A.2d 449 (Law Div.1982), aff'd, 188 N.J.Super. 106, 456 A.2d 114 (App.Div. 1983)), certif. denied, 122 N.J. 129, 584 A.2d 205 (1990). As we stated in Moore v. Youth Correctional Institute, 119 N.J. 256, 271, 574 A.2d 983 (1990), "[t]he Forfeiture Statute ... reflects a belief that the circumstances surrounding a criminal conviction bear directly on an employee's competency and capacity to... perform any ... job for the State."
In State v. Lee, 258 N.J.Super. 313, 317, 609 A.2d 513 (App.Div. 1992), we stated that the purpose behind the Forfeiture Statute was to "codif[y] a long-standing policy against retention of offenders in government service." The Forfeiture Statute "was designed to protect the public, not the offender," and the statute is construed to advance this objective. Pastore v. County of Essex, 237 N.J.Super. 371, 377-378, 568 A.2d 81 (App.Div.1989), certif. denied, 122 N.J. 129, 584 A.2d 205 (1990). Moreover, we went on to state:
It is the public policy of this State that `person[s] holding any public office, position *728 or employment' must avoid committing serious criminal acts or offenses which involve or touch upon their governmental duties, or sacrifice their right to governmental employment. This is a harsh response to a problem serious enough to justify the harshness. The purpose is to prevent miscreants and corrupt officials from again holding office. [Id. at 378-79, 568 A.2d 81 (citations omitted).]
Moore v. Youth Correctional Institute, 119 N.J. 256, 270, 574 A.2d 983 (1990), broadly defined "touches the office" and established the following standard:
When the infraction casts such a shadow over the employee as to make his or her continued service appear incompatible with the traits of trustworthiness, honesty, and obedience to law and order, then forfeiture is appropriate.
Although the Law Division Judge found "no instance in which a person has been forever barred from holding public office based upon conduct occurring at a time when the person did not hold any public office, position or employment," our case law indicates that such conduct may indeed warrant a person being forever barred from public employment. Cf. In re Mattera, 34 N.J. 259, 266, 168 A.2d 38 (1961).
Subsection a. of N.J.S.A. 2C:51-2 applies to persons holding any type of public employment: if such a person is convicted of the types of offenses listed therein, that person forfeits his or her public employment. Subsection d., however, creates the additional penalty of future disqualification from public employment for "any person convicted of an offense touching on his public office, position or employment." The question is whether the Legislature intended the reference to "any person" in subsection d. to apply generally, or only to those "persons" who have forfeited their previously held public positions by virtue of subsection a.
Where the meaning of the statute is not obvious or facially self-evident, courts resort to "[e]xtrinsic aides, such as legislative history, committee reports, and contemporaneous construction ... to help resolve any ambiguity and to ascertain the true intent of the Legislature." Briarglen II Condo. v. Tp. of Freehold, supra, 330 N.J.Super. at 353, 749 A.2d 881, quoting Wingate v. Estate of Ryan, 149 N.J. 227, 236, 693 A.2d 457 (1997). Unfortunately, the legislative history is meager with respect to the intended scope of the term "any person" as used in subsection d.
Absent meaningful legislative history, we look to the purpose of the statute for guidance. Mayfield v. Community Medical Associates, supra, 335 N.J.Super. at 204, 762 A.2d 237. Legislative intent may also be inferred on grounds of policy or reasonableness. Harvey v. Essex County Board of Freeholders, 30 N.J. 381, 392, 153 A.2d 10 (1959); Franklin Estates, Inc. v. Edison Tp., 142 N.J.Super. 179, 184, 361 A.2d 53 (App.Div. 1976), aff'd, 73 N.J. 462, 375 A.2d 658 (1977). The provisions under scrutiny are to be read "sensibly rather than literally, [mindful that] the controlling legislative intent is to be presumed as `consonant to reason and good discretion.'" De Lisa v. County of Bergen, 165 N.J. 140, 147, 755 A.2d 578 (2000), quoting Schierstead v. City of Brigantine, 29 N.J. 220, 230, 148 A.2d 591 (1959).
The Forfeiture Statute is part of a series of provisions dealing with the loss and restoration of rights as a result of conviction of an offense. N.J.S.A. 2C:51-1 to 2C:51-5. As we noted in N.J. Turnpike Employees Union v. N.J. Turnpike Authority, 200 N.J.Super. 48, 54, 490 A.2d 338 (App.Div.), certif. denied, 101 N.J. 294, 501 A.2d 954 (1985), subsection a. of *729 N.J.S.A. 2C:51-2 sets out this State's public policy that persons who hold any public office, position or employment "under the government of this State" must avoid criminal conduct or sacrifice their State position. We concluded that the Legislature intended to include all employees of state government, even Turnpike Authority employees, despite legal precedent and a constitutional provision which excepted authorities from classification as state agencies or political subdivisions. Id. at 52-54, 490 A.2d 338. In Pastore v. County of Essex, supra, 237 N.J.Super. at 377, 568 A.2d 81, we observed that the Forfeiture Statute was intended to preclude anyone who violated the public trust from obtaining a second opportunity to do so.
State v. Musto, supra, 187 N.J.Super. 264, 454 A.2d 449, is of particular relevance. There, the defendant had been re-elected to the New Jersey State Senate and was later indicted and convicted in federal court on twenty-eight counts of conspiracy, racketeering, mail and wire fraud, extortion and income tax law violations. Musto sued to restrain the operation of the Forfeiture Statute and the Attorney General intervened to seek preclusion of Musto's assumption of the Office of Commissioner of Union City to which he had been subsequently elected. Id. at 270-272, 454 A.2d 449. Judge O'Brien, then in the Law Division, stated in Musto that "N.J.S.A. 2C:51-2 only deals with public officers" and "requires forfeiture of a current office" whether or not the offense involves or touches upon that office as long as the offense was one of dishonesty or a crime of the third degree. Id. at 312, 454 A.2d 449. He concluded that it was a "legitimate governmental objective to remove from public office someone convicted of a serious crime, on an offense involving dishonesty, even though it may be totally unrelated to his public office." Ibid. Furthermore, it was within the province of the Legislature to impose the added disability of future disqualification from public employment where the "person [was] convicted of an offense involving or touching upon his public office, position or employment...." Ibid. Although the analysis suggested that the cited section applied only to those convicted while employed or in office, id. at 314, 454 A.2d 449, Judge O'Brien subsequently observed that the disqualification subsection "is a specific statute which applies only to persons convicted of an offense involving or touching on his public office, position or employment...." Id. at 316, 454 A.2d 449.
Given the context of the disqualification provision and the purpose of the Forfeiture Statute, we are led to the conclusion that the Legislature intended the statute, including the "forever disqualified provision," to apply to those persons convicted of the specified types of offenses while they held public office or employment.[4] Our view is reinforced here because subsection d. defines the "any person" subject to disqualification as having been "convicted of an offense involving or touching on his public office, position or employment," and provides that in the future that person "shall be forever disqualified from holding any office or position of honor, trust or profit under this State or any of its administrative or political subdivisions."
*730 In State v. Botti, 189 N.J.Super. 127, 458 A.2d 1333 (Law Div.1983), a mayor was convicted of fifteen counts of mail fraud, two counts of tax evasion, and one count of conspiracy. The crimes were committed while Botti was a salesman for a private company, not while he was in office. The court considered his conduct to be "shameful and disgraceful," and stated that because he defrauded a public agency, he could not be trusted to handle the governmental responsibilities associated with being mayor. The judge held that Botti's conviction after he had been elected warranted his disqualification because it demonstrated indifference to government and disrespect for its ideals. Id. at 136, 458 A.2d 1333. The court declared that Botti forfeited his office as commissioner and mayor.
Although Botti did not specifically address the issue of whether the defendant's acts "touched upon" his office for purposes of permanent disqualification, the case demonstrates the effect of a person's acts as a private citizen on forfeiture of future public employment or holding public office. As in Botti, McCann was convicted while in office of offenses of a similar nature to those in that case. As also was the case in Botti, McCann's conduct occurred prior to becoming mayor. The only issue before the Law Division in Botti was whether Botti had shown good cause to stay the forfeiture of office. Thus, the applicability of the Forfeiture Statute was not in question.
Botti supports the conclusion that the Forfeiture Statute does not require the offense be committed while in public office. Rather, it is the person who holds "any public office, position or employment [and] is convicted of an offense" who "shall forfeit such office or position" if the offense meets the statutory specifications. It is the conviction which triggers the forfeiture and disqualification, not the commission of the offense. As Judge O'Brien observed in Botti, albeit in a different context, the fact of conviction is particularly relevant to forfeiture of office cases. Id. at 139, 458 A.2d 1333. Before conviction, an accused may still hold public office or employment because he or she is presumed innocent. On the other hand, after "conviction that presumption no longer prevails and the law thereafter presumes that the proceedings have been regular and that defendant is guilty." Ibid.[5]
Moore v. Youth Correctional Institute, supra, 119 N.J. at 269, 574 A.2d 983, also supports our conclusion that McCann is forever disqualified from holding public office by virtue of his conviction while in office. The Moore court noted that "it is reasonable that a mayor convicted of mail fraud, extortion, and racketeering should be relieved of public office and barred forever from state employment." Id. at 265, 574 A.2d 983. We gather from this that Moore considered criminal conduct of the type McCann was convicted as touching the public office so as to warrant a person being barred forever from public *731 office, even if, as in Moore, and here, the conduct occurred prior to when the person took public office. As we read Moore, when or where the crime is committed is not relevant to forfeiture. Id. at 270, 574 A.2d 983. What is relevant is whether:
[T]he offense rendered suspect the employee's future service to the State, both in the capacity of the employee's job at the time of the conviction and in every other potential capacity. Hence, we find that the nexus between the offense and employment is not limited by time and location. [Ibid.]
Public policy and case law support our conclusion that the Law Division Judge erred in relying upon the fact that McCann's criminal conduct occurred prior to his taking office to determine that his offenses did not touch on his public office. What is determinative is that, analogous to the situation of the mayor in Botti, McCann's convictions while in office of mail fraud, wire fraud, false statements to a bank and the Internal Revenue Service, income tax evasion, and failure to file a tax return, demonstrate his untrustworthiness and disrespect for government agencies. These offenses render suspect any future service by McCann to the State or its subdivisions in any capacity. Under the standard in Moore, McCann's untrustworthiness and dishonesty "touch on" the office of mayor, thereby warranting permanent disqualification pursuant to N.J.S.A. 2C:51-2d.
Accordingly, McCann is forever barred and disqualified from public office and his name must be removed from the ballot.

II.
Even assuming that the Forfeiture Statute discussed in Point I did not apply to McCann under the circumstances presented, we nonetheless conclude that the disqualification statute under the Faulkner Act (also known as the Optional Municipal Charter Law) does apply and that its provisions with respect to forfeiture pass constitutional muster. We note initially that N.J.S.A. 2C:51-2(3) provides for forfeiture of office if "the Constitution or a statute other than the code so provides." Obviously, this takes into account statutory provisions such as those contained in the Faulkner Act.
N.J.S.A. 40:69A-166 provides:[6]
Any person convicted of a crime or offense involving moral turpitude shall be ineligible to assume any municipal office, position or employment in a municipality governed pursuant to this act, and upon conviction thereof while in office shall forfeit his office; provided, however any person convicted of such an offense who has achieved a degree of rehabilitation which in the opinion of the appointing authority and the Civil Service Commission, as to employment subject to the Civil Service law, indicates his employment would not be incompatible with the welfare of society and the aims and objectives of the governmental agency, may be considered eligible to apply for employment or be continued in employment. Any person who shall violate any of the provisions of sections 17-14, 17-15, or 17-16 of this article shall upon conviction thereof in a court of competent jurisdiction forfeit his office.
Candidates for municipal office in a Faulkner Act municipality are treated differently than in other forms of municipal *732 government not formed under Chapter 69A. N.J.S.A. 40:69A-166 imposes a permanent bar on municipal employment for commission of any crime of moral turpitude, whereas a candidate in a non-Faulkner Act municipality, pursuant to N.J.S.A. 2C:51-2, faces a permanent bar from office only upon commission of an offense which touches upon the public office. Here, the Law Division Judge said, while applying a narrow view of "touches upon the public office," that such "differential treatment of candidates for public office ... implicates an equal protection assessment." He ultimately concluded that "[t]here is no rational legislative purpose to be advanced by precluding persons convicted of crimes of moral turpitude from holding office in Faulkner Act municipalities while permitting such persons to serve in the other forms of government."[7]
Intervenor Manzo argues that the Law Division Judge erroneously concluded that N.J.S.A. 40:69A-166 was unconstitutional under the equal protection clause. He maintains that the judge erred in concluding that there was no rational legislative purpose to be advanced by precluding persons convicted of crimes of moral turpitude from holding office in Faulkner Act municipalities while permitting such persons to serve in other forms of government.
Intervenor asserts first that the Faulkner Act, which is a specific statute that was intended to confer upon municipalities strong powers of local government and home rule consistent with the Constitution of this State, should prevail over more general statutes. Accordingly, he asserts that under N.J.S.A. 40:69A-29 "[e]ach municipality governed by [the Act]... [has] full power to: (a) [o]rganize and regulate its internal affairs, and to establish, alter, and abolish offices, positions and employments, and to define the functions, powers and duties thereof and fix their terms, tenure and compensation."
Second, intervenor argues that because the right to hold public office has not been deemed a fundamental right,[8] the standard to be applied in determining the constitutionality of N.J.S.A. 40:69A-166 is whether the Legislature had a rational basis for enacting the provision. He argues that the power of the mayor to veto ordinances, appoint "high government officials with fixed terms of office, to set salaries, to hire and fire employees and otherwise exercise powers independently of the legislative branch" exceeds the authority of mayors in non-Faulkner Act municipalities. Intervenor also argues that granting a mayor in a Faulkner Act municipality such broad powers and duties "far surpasses a rational or legitimate reason for N.J.S.A. 40:69A-166."
In his equal protection analysis, the Law Division Judge relied upon Matthews v. Atlantic City, 84 N.J. 153, 171, 417 A.2d 1011 (1980), which concluded that a two year residency requirement under the Walsh Act[9] for eligibility for the office of city commissioner could not pass Fourteenth Amendment equal protection muster when the State's legitimate purpose for its residency requirement lost meaning *733 when applied to what was then only 40 out of 567 municipalities in the State. The judge noted that because "[a]ll types of New Jersey municipalities enjoy the same basic powers and have the same basic responsibilities[,]" Faulkner municipalities, which simply establish a more modern form of municipal government, may not deem certain persons unworthy to hold office while non-Faulkner municipalities permit these same persons to hold office.
We disagree. The federal equal protection clause does not require that government treat all persons identically; it requires that differences in treatment of persons similarly situated be justified by appropriate state interest. U.S. Const. amend. XIV; Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., Inc., 80 N.J. 6, 37, 364 A.2d 1016 (1976), cert. denied, 430 U.S. 977, 97 S.Ct. 1672, 52 L.Ed.2d 373 (1977).
Federal courts have applied a multi-tiered analysis to determine whether a statute violates the Equal Protection Clause of the Fourteenth Amendment. Matthews v. Atlantic City, supra, 84 N.J. 153, 417 A.2d 1011. Under this analysis, most statutes satisfy constitutional standards if they are rationally related to a legitimate governmental interest. Kadrmas v. Dickinson Public Schools, 487 U.S. 450, 458, 108 S.Ct. 2481, 2487, 101 L.Ed.2d 399, 409 (1988); U.S.A. Chamber of Commerce v. State, 89 N.J. 131, 157-158, 445 A.2d 353 (1982); American Fire & Cas. Co. v. New Jersey Dep't of Ins., 256 N.J.Super. 423, 428, 607 A.2d 196 (App. Div.1992).
When legislation impinges upon a fundamental right, or disparately treats a suspect class, it is subject to strict scrutiny, Rinier v. State of New Jersey, 273 N.J.Super. 135, 140, 641 A.2d 276 (App. Div.1994) (citing Drew Assocs. of NJ, LP v. Travisano, 122 N.J. 249, 258, 584 A.2d 807 (1991), certif. denied, 138 N.J. 269, 649 A.2d 1288 (1994), cert. denied, 514 U.S. 1016, 115 S.Ct. 1358, 131 L.Ed.2d 216 (1995)), thereby requiring that the statute be the least restrictive alternative to accomplish a compelling governmental interest. San Antonio School District v. Rodriguez, 411 U.S. 1, 16-17, 93 S.Ct. 1278, 1287-1288, 36 L.Ed.2d 16, 33 (1973), reh'g den. 411 U.S. 959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973). Under certain circumstances, courts have also applied intermediate scrutiny, where a statute is upheld if it serves important governmental interests and is substantially related to those interests. Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).
Because no fundamental right or suspect class is implicated here, the federal equal protection analysis employs the rational-basis standard. Drew Assocs. of NJ, LP v. Travisano, supra, 122 N.J. at 258, 584 A.2d 807; Brown v. City of Newark, 113 N.J. 565, 573, 552 A.2d 125 (1989); see Bullock v. Carter, 405 U.S. 134, 142-143, 92 S.Ct. 849, 855-856, 31 L.Ed.2d 92, 99 (1972) (holding that there is no fundamental right to run for office); see also Abramowitz v. Kimmelman, 203 N.J.Super. 118, 495 A.2d 1362 (App.Div.1985) (holding that a law that merely affects voting, without actually denying the right to vote or depriving voters of equal representation, is usually not subject to strict scrutiny). The equal protection safeguard "is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective." McGowan v. State of Maryland, 366 U.S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393, 399 (1961).
When considering equal protection type challenges under the State Constitution, our courts have rejected the multi-tiered approach in favor of a less rigid *734 balancing approach. Right to Choose v. Byrne, 91 N.J. 287, 309, 450 A.2d 925 (1982). "In striking the balance, we have considered the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction." Greenberg v. Kimmelman, 99 N.J. 552, 567, 494 A.2d 294 (1985); accord In Re Charter School Application, 320 N.J.Super. 174, 237, 727 A.2d 15 (App.Div.1999), aff'd as modified, 164 N.J. 316, 753 A.2d 687 (2000). For a statute to be rationally related to the public interest, it need not be the best or only method of achieving the legislative purpose. In the Matter of CVS Pharmacy, 116 N.J. 490, 498, 561 A.2d 1160 (1989). There are numerous instances where the Faulkner Act applies different criteria than for non-Faulkner Act municipalities. See, e.g., Meridian Development Co. v. Edison Tp., 91 N.J.Super. 310, 314, 220 A.2d 121 (Law Div.1966) (then applicable zoning procedures superseded by Faulkner Act).
The Faulkner Act intended to confer the greatest possible power of self-government, consistent with the New Jersey Constitution, upon municipalities adopting a plan pursuant to the Act, as well as reduce the large number of types of local government with all their varying rules and regulations by providing a flexible pattern adaptable to various communities and their needs. City of Newark v. Department of Civil Service, 68 N.J.Super. 416, 424, 172 A.2d 681 (App.Div.1961). Obviously the availability of different forms of government was meant to allow choice. As long as the subject of the legislation applies equally to all affected by the particular form of government, different classifications and powers found in different forms of government will pass constitutional muster.
In City of Newark we held that the purpose of N.J.S.A. 40:69A-166 was clear and that it was intended as a safeguard for the public. Id. at 425, 172 A.2d 681. Persons convicted of a crime involving moral turpitude were ineligible to hold an office or position in any municipality operating under the Faulkner Act.
This result is neither harsh nor unique. It is well established that there is no fundamental right to be a candidate for office. Bullock v. Carter, supra (405 U.S. at 143-144, 92 S.Ct. at 856, 31 L.Ed.2d at 99); Matthews v. Atlantic City, supra, 84 N.J. at 168, 417 A.2d 1011; Wurtzel v. Falcey, 69 N.J. 401, 403, 354 A.2d 617 (1976); State v. Musto, supra (187 N.J.Super. at 311, 454 A.2d 449).
In Musto the Forfeiture Statute, N.J.S.A. 2C:51-2, was upheld against an equal protection challenge: "Obviously, it is a legitimate governmental objective to remove from public office someone convicted of a serious crime, on an offense involving dishonesty, even though it may be totally unrelated to his public office." 187 N.J.Super. at 312, 454 A.2d 449. Thus, the question is whether there is a valid governmental purpose for the application of N.J.S.A. 40:69A-166 to Faulkner Act municipalities.
As noted, in striking down N.J.S.A. 40:69A-166, the Law Division Judge relied in large part on Matthews v. Atlantic City, supra, 84 N.J. 153, 417 A.2d 1011. However, in our view the judge misapplied the holding in Matthews. Matthews considered whether a two year durational residency requirement that applied to candidates for public office in Walsh Act municipalities violated the Equal Protection Clause of the federal constitution. Id. at 155, 417 A.2d 1011. Although Matthews acknowledged there is no fundamental right to hold public office, the Court nevertheless determined that "[t]he individual *735 interests affected by the residency requirement convince us that under federal constitutional law, something more than mere rationality is necessary to support the requirement." Id. at 168-169, 417 A.2d 1011. Heightened scrutiny was required because the statute indirectly impinged upon both the fundamental right to vote and the fundamental right to travel. Ibid.
Matthews relied heavily upon Gangemi v. Rosengard, 44 N.J. 166, 175, 207 A.2d 665 (1965), which determined that a law requiring candidates for elective office only from first class Faulkner Act cities, but not other Faulkner Act municipalities, had to be registered voters for at least two years before the election (as well as residents for that period), violated the equal protection clause because the statute's two year registration classification lacked a critical connection to the object of the law.
Even under Matthews's equal protection analysis, this statute passes constitutional muster. Matthews held
that a requirement or restriction for candidates for elective office must be reasonable and suitably tailored to further legitimate governmental objectives. We believe this to be consistent with the approach outlined in Bullock of "examin[ing] in a realistic light the extent and nature of [the] impact" on voters of barriers to candidacy.

[84 N.J. at 169, 417 A.2d 1011.]
Thus, the question before us is whether the disqualification provision in the Faulkner Act, N.J.S.A. 40:69A-166, reasonably furthers legitimate governmental objectives. The focus is on whether there exists a legitimate governmental objective in treating Faulkner Act municipalities differently from those which do not choose that form of government.
The legislative history of the Faulkner Act makes it clear that the Act was a codification of the February 1950 Second Report of the Commission on Municipal Government (the Report) of which Bayard Faulkner was chairman. Indeed the statement appended to L. 1950, c. 210, Assembly Bill A-10, of which N.J.S.A. 40:69A-166 was a part, stated that "[t]his is the principal bill intended to carry out the recommendations contained in the Report of the Commission on Municipal Government, submitted to the Governor and the Legislature February 20, 1950."
The Report has language which provides insight as to why the Legislature would have deemed such a provision necessary. The Report is in two sections: the first is a summary of its recommendations, and the second is a "proposed Optional Municipal Charter Law," the provisions of which substantially became the Faulkner Act. Of particular interest to the present case is the Report's summary of Article 2 of the proposed law which concerns municipal incorporation and powers. The Report states:
This article is a key article in the proposed new system of optional charter plans. It establishes practical inducements to charter improvement, by offering municipalities extensive powers of local self-government and relief from the need for specific legislative approval to undertake new or different municipal services.

[Report, p. 2.]
The Report describes the incorporation option and then notes that legislative classification of municipalities would be eliminated, "so far as possible," because "the powers of municipalities adopting these plans are made sufficiently broad to eliminate the need for classified legislative treatment so far as possible." Id. at 3. The most pertinent part of the Report, *736 however, is its description of the "New Powers" enjoyed by municipalities which opt for these plans:
The act would grant broad new powers to municipalities governed by any of the optional forms:
(1) The new powers are stated in general terms rather than by specific enumeration, so as to provide the maximum home rule under the new Constitution.
(2) The provisions of the new Constitution intended to broaden the legal powers of local government are given legislative effect.
(3) Although municipal government still remains subject to the control of the Legislature as required by the new Constitution, legislative control is expressed in a broad and complete authorization which leaves the widest possible discretion with each municipality to determine the organization of its department, the compensation of its officers and employees, the range and character of its services, subject to the provisions of general law which apply to all municipalities.

[Ibid.]
The next section of the Report summary describes the form of government chosen by Jersey City: mayor-council. In all forms of the mayor-council plans the mayor has formidable powers: There is a "concentration of administrative authority in an elected mayor, who is also given a veto power over ordinances." Id. at 3. Although the legislative power is exercised by an elected council, the mayor is given "power commensurate with his administrative responsibilities":

Office of Mayor: The executive power shall be exercised by a mayor elected for a four-year term. Supervisory powers of the mayor include the enforcement of laws, supervision of departments and the power to make recommendations to the council. General powers of the mayor include appointment or boards or commissions, nomination, appointment and removal of department heads and a veto over ordinances that can be overridden only by an extraordinary majority of the council.

[Id. at 4.]
The budget is prepared by the mayor with assistance from the business administrator and all department heads serve at the pleasure of the mayor. Id. at 4-5.
The summary section makes no mention of office-holder eligibility. However, the proposed Charter Law in the second part of the Report has a section "C. Officers and Employees." The five paragraphs set out restrictions imposed on officers and employees "elected or appointed" and forbid them from having any interest in municipal contract work (now N.J.S.A. 40:69A-163); receiving any benefit from a municipal utility or service provider (now N.J.S.A. 40:69A-164); promising or giving anything of value in return for support (now N.J.S.A. 40:69A-165); running for office if convicted of a crime of moral turpitude (now N.J.S.A. 40:69A-166); and failing to appear or testify in court or before a legislative committee (now N.J.S.A. 40:69A-167).
Given the broad, unprecedented sweep of powers the Legislature ultimately put in the hands of mayors and other elected officials in these newly configured municipalities, it is not unexpected that it also sought to regulate those who would exercise those powers. Requiring that those who would head Faulkner Act municipalities have the utmost integrity and honor is reasonable and clearly rationally related to the legitimate governmental objective of the Legislature in enacting the Faulkner Actsecuring the most effective form of municipal governing organization allowable under the then new Constitution for those *737 municipalities who choose that form of government.
Generally, courts try to resolve issues by avoiding constitutional questions. In Matthews, Justice Sullivan concurred with the result but found no equal protection basis to invalidate the residency requirement. He observed that the electorate of Atlantic City could have voted to adopt a form of government other than that made available by the Walsh Act to avoid the residency requirement for its elected governing body. Since the voters always had the right to change the form of government to eliminate the residency restriction, there was no equal protection problem. 84 N.J. at 174, 417 A.2d 1011.
Justice Sullivan cited Jamouneau v. Harner, 16 N.J. 500, 109 A.2d 640 (1954), cert. denied, 349 U.S. 904, 75 S.Ct. 580, 99 L.Ed. 1241 (1955), in support of his equal protection analysis. There, an equal protection challenge was brought against the State Rent Control Act of 1953, N.J.S.A. 2A:42-14 et seq., the provisions of which applied only to municipalities that opted for its protection by passing a resolution reciting that a housing shortage existed and that rent control was required. Id. at 517, 109 A.2d 640. In response to the equal protection challenge, the Court said that "an exercise of the police power is not to be struck down as in contravention of the due process and equal protection clauses, `unless it be palpably unreasonable or unduly discriminatory'; and fairly debatable questions as to need and the propriety of the means employed to meet the exigency are within the legislative province." Id. at 518-19, 109 A.2d 640. The fact that the municipality in that case had opted for rent control, but not the six surrounding municipalities, did not implicate an unreasonable classification or equal protection principles:
Where the regulation, in itself not unreasonable and arbitrary, operates uniformly upon all persons similarly situated in the particular district, the district itself (within the municipality) not appearing to have been arbitrarily selected, it cannot be judicially declared that there is a deprivation of property without due process of law, or a denial of the equal protection of the laws, within the meaning of the Fourteenth Amendment.

[Id. at 521, 109 A.2d 640.]
Every municipality that chooses a Faulkner Act form of government is subject to the same restriction in N.J.S.A. 40:69A-166. The decision to impose that restriction was a reasonable one given the broad scope of power vested in the mayor and other elected officials of those municipalities. The voters chose to partake in the benefits of the Faulkner Act, and thus there was nothing arbitrary about the imposition of the restriction upon those voters.
Unlike the voting durational requirements in both Matthews and Gangemi, N.J.S.A. 40:69A-166 is rationally related to its legitimate purpose. The Faulkner Act confers on municipalities broad powers to protect the public interest through its provisions, including Section 166 which precludes persons convicted of certain crimes from running for offices of public trust in those communities.
Unlike Matthews, the statute at issue here does not impinge upon the fundamental right to travel. To the extent it might impinge upon the right to vote, it would be to a far lesser degree than the durational residency statute found wanting in Matthews. While both statutes indirectly impact on the right to vote, the durational residency requirement discussed in Matthews would appear more likely to limit voters' choices by restricting far more individuals *738 from running for office than would the Faulkner Act forfeiture provision.
In contrast, in Wurtzel v. Falcey, supra, 69 N.J. at 403-404, 354 A.2d 617, the Court said that "classifications based on residence, age, and citizenship are expressive of the state's legitimate interest in the integrity of the ballot, and if these classifications are reasonable, they are constitutionally inoffensive." In short, the "nature of the affected right" here is more akin to that in Wurtzel than Matthews. We conclude, based on the public policy interests and the strong executive form of government under the Faulkner Act, that there is a rational purpose for the Faulkner Act forfeiture provision.
Reversed and remanded for entry of an order forever disqualifying Gerald McCann from holding public office in this State, as well as removing his name as a candidate for the office of mayor from the ballot for the May 8, 2001 election in the City of Jersey City.
NOTES
[1] This was apparently the second time McCann had been elected mayor, with a hiatus between terms served.
[2] Notice was given to the Attorney General in accordance with R. 4:28-4, and R. 2:5-1(h) as to the attack on the constitutionality of the statute, but his office elected not to participate on either the trial or appellate levels.
[3] Our decision in Point II hereof may implicate the applicability of subsection a(3).
[4] The disqualification subsection reference to "any person" would not seem to permanently exclude from public employment all those convicted of an offense involving dishonesty where neither the criminal acts nor the conviction occurred while the person was in office.
[5] In most of the other reported cases the individuals subjected to the statutory penalty were public employees at the time of their convictions. See, e.g., State v. Lazarchick, 314 N.J.Super. 500, 505, 715 A.2d 365 (App.Div.), certif. denied, 157 N.J. 546, 724 A.2d 804 (1998) (defendant was a police officer convicted of disorderly persons assault and petty disorderly person harassment); State v. Lee, 258 N.J.Super. 313, 314, 609 A.2d 513 (App. Div.1992) (defendant was a corrections officer convicted of theft by deception); State v. Baber, 256 N.J.Super. 240, 242, 606 A.2d 891 (Law Div.1992) (Turnpike utility worker convicted of simple assault and failure to make lawful disposition of drugs); and State v. Musto, supra, 187 N.J.Super. at 269, 454 A.2d 449 (State senator convicted of various federal charges).
[6] We point out that Section 166 appears in Article 17 of Chapter 69A of Title 40, entitled: "Article 17. Additional Provisions Common to Optional Plans." Thus, the provisions of Section 166 apply to various optional forms of municipal government authorized in Chapter 69A. The proviso portion of the statute is not applicable to McCann's situation.
[7] The judge noted that there were now "approximately 127 Faulkner Act municipalities" out of 567 municipalities in the State.
[8] See, e.g., Bullock v. Carter, 405 U.S. 134, 142-143, 92 S.Ct. 849, 855, 31 L.Ed.2d 92, 99 (1972); Matthews v. Atlantic City, 84 N.J. 153, 168, 417 A.2d 1011 (1980); State v. Musto, supra, 187 N.J.Super. at 311, 454 A.2d 449.
[9] The Walsh Act (N.J.S.A. 40:70-1 et seq.) (L. 1911, c. 221), was referred to as the Commission Form of Government. Interestingly, Atlantic City is no longer a Walsh Act municipality, having since adopted the Faulkner Act provisions.